**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ELLIOTT ABRAMS**, **CRAIG**
**SEEGMILLER, VINCENT GLASS,**
**ROBERT REEVES, JERMAINE,**
**CAMPBELL, and LAMONT HEARD,**
individually, and on behalf of all other
similarly situated,

      Plaintiffs,

-v-                                                              Case No.
                                                                 Hon.
**WILLIS CHAPMAN**, Warden, Macomb
Correctional Facility; **Noah Nagy**,
Warden, G. Robert Cotton Correctional
Facility (JCF); **MELINDA BRAMAN**, Warden,
Parnall Correctional Facility (SMT); **Bryan**
**Morrison**, Warden Lakeland Correctional
Facility (LCF); **HEIDI WASHINGTON**,
Director**,** Michigan Department of Corrections;
sued in their official capacities,

      Defendants.                                **IMMEDIATE RELIEF SOUGHT**

_____/

**COMPLAINT FOR CLASS CERTIFICATION**
**AND FOR TEMPORARY RESTRAINING ORDER**
**AND PERMANENT INJUNCTION**

Plaintiffs, by and through counsel Daniel E. Manville, Mich. State Univ

Clinical Law Professor, and Kevin Ernst of Ernst Charara & Lovell, PLC, request

that the Court grant an injunction requiring the Defendants to follow the guidelines

1

for prisons issued by the Center for Disease Control (CDC) during the COID-19

pandemic.

## INTRODUCTION

The Middle District Court for the State of Louisiana recently stated:

> [T]he exponential growth of the novel coronavirus has resulted in
> emergency declarations by the President and the Governor, as well as
> governors of numerous other states. Due to the nature of this virus, the
> risk of contracting the virus in a prison environment, where at least 23
> inmates have already tested positive, poses a sufficiently high risk,
> rendering this matter ripe for adjudication even though Plaintiff has not
> contracted the virus. The United States Supreme Court has held that the
> risk of contracting a serious disease may indeed constitute an unsafe,
> life-threatening condition that violates the Eighth Amendment. *Helling
> v. McKinney*, 509 U.S. 25, 33, … (1993). Further, the Supreme Court
> held that it would "be odd to deny an injunction to inmates who plainly
> proved an unsafe, life-threatening condition in their prison on the
> ground that nothing yet had happened to them." *Id.* With the clear
> danger posed by COVID-19 in the [prison], Plaintiff has adequately
> demonstrated standing.[1]

1.      Plaintiffs, and the proposed class members, all of whom are prisoners under

the jurisdiction of the Michigan Department of Corrections (MDOC), claim that the

failure to follow the CDC's COVID 19 Guidelines for prisons violates their Eighth

Amendment rights by exposing them to substantial risk of illness and death. Social

distancing and hygiene measures are currently the only defense against COVID-19

while in prisons. Those protective measures are exceedingly difficult if not

---

[1] *Marlowe v. LeBlanc*, CV 18-63-BAJ-EWD, 2020 WL 1955303, at *2 (M.D. La. Apr. 23, 2020).

impossible, in the current environment of a prison, where Plaintiffs share sleeping quarters, toilets, sinks, phones, and showers, eat in communal spaces, and are in close contact with the many other detainees and officers.

2.      Prisons provide an ideal environment for an infectious disease to spread. They are designed to keep large numbers of people in relatively small spaces with very little personal space or privacy.  Prisons are often filled to prescribed limits, if not over the limits.  Thus, the possibility of social distancing is extremely limited to begin with. **Despite this, in all Michigan prisons, Defendants are providing very little personal protection equipment and products, if any, to Plaintiffs, and the proposed class members, to safeguard against the spread of the Novel Corona Virus to inmates and prison staff.  As of April 23, 2020, this failure has resulted in** 1325 inmates testing positive out of the 2381 inmates tested - .55% infection rate of those tested.[2]   This is more than 2 times the state average for person tested who have serious symptoms.[3]  Based on prison data, only 13 prisons out of 30 have not had at least one inmate test positive[4], most of which are located in the Upper

[2] MDOC does not test their own staff. "But the agency isn't testing its own staff, though two Michigan corrections officers have died from the virus. The Detroit News reported that at least 210 of the state's 12,000 corrections staff have tested positive. The department, like most states, relies on staff getting tested elsewhere if they show symptoms." https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections

[3] https://www.clickondetroit.com/news/michigan/2020/04/09/tracking-michigan-covid-19-tests-data/

[4] *See* attached Exhibit 2, https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337

Pennisula.  However, given the lack of random testing, there is no evidence to conclude that the virus is no present in those institutions. As of April 23, there were 30 reported deaths among inmates. MDOC has acknowledged that staff members have also tested positive for COVID-19 and some have died[5], yet has done nothing to thoroughly test staff or otherwise prevent them from spreading the deadly virus to inmates.

3.      Certain Michigan prisons have recorded high percentages of inmates that have tested positive for COVID-19, such as Macomb Correctional Facility, G. Robert Cotton Correctional Facility, Parnall Correctional Facility, Lakeland Correctional Facility, and Women's Huron Valley Correctional Facility. *See* Exhibit 2. MDOC has not tested the entire population raising concerns that high numbers of inmates are positive, but have not been tested.[6] Michigan has tested the entire population of only one prison (Lakeland), unlike other states which have aggressively tested inmate populations.[7]  At Lakeland, some 800 prisoners, approximately 55% of the inmate population, tested positive; 80% of the prisoners testing positive were

---

[5] *See* Exhibit 3; *id*.

[6] Other states are performing massive testing of inmates so that they can bring the spread of COVID-19 under control. However, testing of only inmates will not allow Michigan to control the spread of COVID-19 because MDOC does not test its officers.

[7] *See* attached Exhibit 4, Marion Correctional Facility, in Ohio, tested its entire prison population and found that 1,828 inmates – 73% of its population – tested positive. https://www.marionstar.com/story/news/local/2020/04/19/1-800-inmates-marion-correctional-positive-coronavirus/5163285002/

asympomatic.[8] Most of these prisoners are in the high risk population .[9] MDOC has

confirmed that not all tests results have been returned.[10]  According to reports, based

on the testing results from Lakeland, MDOC will now begin testing all inmates at G.

Robert Cotton Correctional Facility the week of April 26, 2020.

4.       It is extremely likely that the COVID-19 situation for inmates will get worse,

and not better, unless something is done to require Defendants to implement the

CDC's guidelines for prisons, especially as they pertain to separating infected

individuals, providing personal protective equipment to inmates and staff, ensuring

social distancing for housing, feeding and yard, providing for the separation of

chronic care inmates and other vulnerable populations, and ensuring sanitization of

surfaces that can spread the virus.

5.       Despite the ticking time bomb that COVID-19 represents, MDOC has

failed to implement necessary or adequate policies and practices throughout its

prisons. Plaintiffs have been denied proper and equal access to vital preventative

measures to avoid the transmission of COVID-19, in violation of federal law and

the United States Constitution. While the MDOC adopted policies in response to

---

[8] https://www.fox17online.com/news/coronavirus/785-inmates-test-positive-for-coronavirus-at-prison

[9] According to the Public Relation Person for MDOC, "Lakeland houses about 1,400 inmates, half of which Gautz said are over the age of 55 or have chronic health conditions." https://komonews.com/news/coronavirus/600-inmates-test-positive-for-covid19-in-one-michigan-prison

[10] *See* attached Exhibit 5, https://nbc25news.com/news/coronavirus/600-inmates-test-positive-for-covid19-in-one-michigan-prison

this pandemic, they only encompass some of the guidelines recommended by the CDC while ignoring critical measures of the recommended guidelines for halting the spread of the disease, including widespread testing, social distancing, and, perhaps most importantly, separation of inmates who test positive from those who are not positive. Notably, MDOC has failed to implement or enforce many of the policies it did adopt at different prisons.

6.    MDOC's failure is especially harmful to Plaintiffs and the classes they seek to represent. The Lakeland Corrections Facility (LCF) confines many aged and chronic care inmates.  LCF houses a large population of inmates that are over 65, have serious pre-existing health conditions, or both. The CDC warns that these are precisely the type of people most at risk for serious illness, or even death, from COVID-19. Yet, MDOC has not taken meaningful measures that will control the spread of COVID-19.

7.    In LCF's Housing Unit 2-E, which is a Pole Barn, residents of Unit 2-E were recently told by health service and prison staff that since some of the residents had already tested positive thus exposing the other residents, there was no reason to quarantine the infected inmates from those that had not yet been tested.[11] Insead, MDOC has apparently chosen to quarantine entire housing units

11 See attached Exhibit 13, Declaration of Heard, para. 4.

containing both infected and non-infected inmates without separating the known infected population.[12]

8.    MDOC's failures do not just affect inmates. Prison health is community health. An outbreak at any one prison could easily spread to the surrounding communities through prison and medical staff. Time is running out for proper protections to be put into place. Plaintiffs seek immediate relief from this Court before it is too late.

## Named Plaintiffs and Factual Allegations

9.    Plaintiff **Elliott Abrams**, 974262, is an inmate presently confined at Macomb Corrections Facility (MRF). At all times relevant, he was confined with MDOC under a criminal sentence issued by a court of the State of Michigan. *See* attached Exhibit 7. Even though Abrams has a compromised immune system because he had his spleen removed prior to entering the prison system, he is required to share a cell with another inmate.  Since his incarceration, MDOC has been aware that he has a compromised immune system.[13]

---

[12] Counsel Manville was schedule to have legal telephone calls with inmates at the Cotton Prison on April 17 and then another legal call on April 20 at the Parnall Prison. These calls were canceled due to entire housing units at each of the two prisons being placed under quarantine. These cancellations were contrary to MDOC's policy.

[13] On April 13, 2020, Abrams filed two grievances as to being subjected to COVID-19. One grievance was addressed to the Warden-Defendant and the other directed at the Director-Defendant. A response was provided to both grievances. The grievance against the warden was rejected claiming he was following policy, and could not resolve Abrams' claim. The grievance against the Director was rejected as being duplicative. Abrams then sought second step grievance forms but has not received such forms yet.

10.     Abrams's parole date is next year. He fears he will not live to see that date. He is forced to share a cell with another inmate with little to no effort to enforce social distancing, with no personal protection equipment, and lives in constant fear he will contract COVID-19.  He has seen infected inmates removed from the prison in body bags and fears he might be the next one.

11.     Defendants have designated numerous cells at MRF for double occupancy. Each cell includes two desks, two chairs, a bunk bed, and two personal property footlockers. At MRF, some of the cells do not have their own bathrooms. Instead at the beginning of each of the four levels or "wings" of the prison, there is a community bathroom with three toilet stalls, two urinals, four sinks, and two wall mounted electric hand dryers and two showers stalls.  Each of the four wings has two payphones, a drinking fountain, a garbage can, a kiosk and a microwave located by the stairs leading up to the cells. At least 16 inmates are now housed on cots in the dayroom due to overcrowded conditions, and these inmates use the same bathroom, kiosk, microwave, telephone, and chow area as the other inmates.

12.     Abrams has observed that commonly used areas are not consistently wiped, disinfected or cleaned.

13.     Prison meals are served in common areas where inmates are not required to maintain spacing of six feet while waiting to be served their food. The telephones

are not disinfected after each use and there is no restriction limiting the number of people who can use either of the phones, and they are constantly handled by multiple inmates every waking hour.

14.    There is a kiosk room in the unit that contains a "JPAY" system (similar to a computer which allows inmates to send emails to family members and others) and a store, where twice a month inmates can order items from the prison store to be delivered to the housing unit. Generally, staff will allow only two inmates in the kiosk room at the same time, however, the kiosk room is not sanitized after each use. Inmate porters undertake only one cleaning per each eight hour shift.

15.    Each staff member is required to do three shakedowns for each shift worked. Abrams repeatedly observed officers conduct shakedowns of multiple inmates without changing gloves or otherwise disinfecting their hands and persons.

16.    Plaintiff **Craig Seegmiller**, 327625, is an inmates presently confined at G. Robert Cotton Facility (JCF), Jackson, Michigan. At all times relevant he was confined with MDOC under a criminal sentence issued by a court of the State of Michigan. *See* attached Exhibit 8.

17.    Seegmiller is confined in a pole barn at JCF. He is confined in a cubicle with seven other inmates in an area that is approximately 10 by 12 feet. It is physically impossible for eight people to maintain six feet of social distancing in an area measuring 10 x 12 feet.  There are a total of 20 cubes in the pole barn, with a total

9

population of 160 inmates.  Each side of the pole barn has 10 cubes. There are two

bathrooms on each side of the pole barn. Each bathroom has three shower stalls, three

urinals, and four toilets for the 80 inmates in each side.

18.     The ceiling in the polebarn is approximate 12 feet high. The divider walls of the

cubes are eight feet high, thus allowing for the free flow of air (and potentially

coronavirus particles beween cubes

19.     There are two JPAY computers, one store kiosk, and five telephones on each side

which are shared by the 80 inmates on each particular side. Plaintiff Seegmiller has

never observed the phones, the computers or the store sanitized by prison porters or

staff after being used by other inmates.  Prison staff has made available a limited supply

of cleaning materials for each day but these supplies quickly run out and once the daily

cleaning supplies are exhausted, none are available until the next day.

20.     As of April 20, 2020, five of the inmates in Seegmiller's cube tested positive.

However, Seegmiller was never tested and became extremely distressed.  After

expressing his concerns, he was temporarily moved to a different housing unit for

approximately 36 hours, and then returned to the pole barn under the same conditions

without being tested.[14] He constantly lives in fear that he will die because of the lack

---

[14] Seegmiller filed two grievances. One was against the Warden and the other against Director
Washington on April 9, 2020. These grievances were returned to him on April 13, 2020.  He filled
out and submitted step II's appeals for both grievances on April 17, 2020 but has not received
responses.

of treatment and testing provided to inmates even after they have been exposed to inmates with known infections.

21.     On April 17, 2020, after several inmates tested positive, JCF staff went through each pole barn and cut the power to ceiling fans, ostensibly to prevent the airborn spread of the coronavirus, however, that was the extent of the protective measures provided by MDOC. Seegmiller was not provided with the ability to social distance and was not proved any PPE or sanitizing products.

22.     Plaintiff **Robert Reeves**, 222810, is also presently confined at JCF, but is not in the pole barns. At all times relevant he was confined with MDOC under a sentence issued by a court of the State of Michigan. *See* attached Exhibit 9.

23.     Prior to his confinement at JCF, Reeves was confined at Parnall Correctional Facility (SMT) in Jackson, Michigan. At SMT, he contracted COVID-19 when he was housed in 58-B "10 block". He was only at Parnall for one month, from February 25, 2020, to March 28, 2020. There, he was confined in a one-man cell that had open bars. There were more than 300 inmates confined in the open-bar cell block with him. These 300 inmates share 13 open showers. Reeves was required to go to chow hall at SMT. Inmates stood in line waiting for food in close proximity to other inmates, and once they got to the chow hall, they sat two at a table, about two feet from each other. Reeves was only given a mask after he tested positive for COVID-19. He was forced into close proximity with other infected inmates prior to testing positive.

24.     After Reeves tested positive for COVID-19, the only "care" he received was a transfer from SMT to JCF, where he was placed in a one-man cell.  The next day, another positive inmate was placed in the cell with him.

25.     Reeves was given a mask on March 28th, and 16 days later, he still had the same mask. He was told to "wash" the mask that he has. When he tried to exchange his mask for a new one, staff told him that they don't have extras.

26.     On April 14th, Reeves observed that staff members were not wearing gloves or masks when handing out various items to inmates, despite the known infections

27.     JCF K-Unit, where Reeves is placed, appears to be designated for inmates who tested positive for COVID 19. These inmates share the same showers, bathroom, phones, JPAY and kiosks.

28.     K-Unit has 88 cells, with two inmates to a cell. Each cell is eleven by eight feet. There are three showers in K-unit, and one inmate is allowed in each shower at a time. Reeves observed the bathroom in K-unit being cleaned only one time per day by an inmate who is positive for COVID-19.

29.      There is a nurse in K-unit at all times wearing a mask. The nurse calls each inmate out of their cell every day to take their blood pressure and temperature. Inmates sit in the same chair, and the same medical equipment and supplies are used without being cleaned or disinfected between inmates. The nurses do not change their gloves from inmate to inmate.

30.    Reeves has not been given any supplies to clean his cell. There is a mop and broom in K unit for all inmates to use; this is the same mop that is used to clean the bathroom.

31.    Inmates are fed in their cells. He has not seen a doctor, nor did he receive medical instructions on what to do if his symptoms get worse, despite complaining of chest pain, coughing up blood, and having problems breathing. Reeves was told it was normal and to just endure it.

32.    Because Reeves tested positive for COVID-19, he is not permitted to send "kites" (internal correspondence), mail, or to file grievances.

33.    After 21 days in quarantine at JCF, Reeves was transferred to Gus Harrison in Adrian, Michigan. At Gus Harrison, he is allowed to send out mail and write grievances, but because he keeps being transferred, it is hard to get the grievance responses back from the Grievance Coordinator, or a receipt that the grievance was received.

34.    Plaintiff **Vincent Glass** is also confined at SMT. At all times relevant he was confined with MDOC under a sentence issued by a court of the State of Michigan. *See* attached Exhibit 11.

35.    Glass is confined in 10-block This block is five ("5") floors high, with the back part of the cells part of the exterior walls. This means that the cell fronts are facing each other with a gap of about forty ("40") feet from the south wall to the north inside of the cell block. The cellblock is about a football field long and has

approximately three hundred and seventy ("370") individual cells. Based on its design, there is no method for preventing the spread of the COVID-19.

36.     The inmates confined to 10-block are told to social distance themselves from other inmates, but that is not possible. Each cell has bars on the front of it so that inmates are always passing your cell on a gallery that is about three ("3") feet wide. For an inmate to leave his cell and go to base, to go to chow, to take a shower, or to use the telephone, Glass had to go by 10 to 30 inmates who were within two feet of him so he could get to the stairs to go to the base. When Glass would go to the chow hall, there were inmates in the chow hall either eating or waiting to get served and no social distancing was required. There is no distance of six ("6") feet required in the chow hall.

37.     Glass was confined on the upper level of 10-Block.  To go to chow, the bathroom, the shower, etc., Glass had to pass within close proximity of 10 to 3 inmates. When engaging in these activities, it was all but impossible to maintain six feet of social distancing between other inmates.

38.     Glass was told by MDOC officers that Warden-Defendant Melinda Braman approved the placement of COVID 19-positive inmates in 10-block without additional steps to separate and protect 10-block inmates from the known COVID-19 positive inmates.

39.   **Jermaine Campbell**, 1745168, is housed at JCF. At all times relevant he was confined with MDOC under a sentence issued by a court of the State of Michigan. *See* attached Exhibit 12.

40.   Campbell has been treating for asthma while housed in MDOC custody and is highly susceptible to severe respiratory complications if infected with COVID-19.

41.   Campbell lives in an eight man cube that is 20 by 10 feet. He sleeps within three of his cell mates. He eats in the same area as other inmates and cannot adhere to CDC standards for social distancing. He was given two masks made out of state issued clothing, no replacement masks have been issued, and he has received no other PPE.

42.   Campbell is a parole violator, has served his minimum sentence, and is therefore eligible for immediate parole.  However, he has not been informed if and when he will be released on parole.

43.   Campbell is familiar with DOM 2020-29 or 30 (the MDOC policy for COVID-19) issued by MDOC Director Washington. It is flagrantly being ignored by staff at JCF.

44.   Officer Dettloff was confirmed as having COVID-19 on April 18, 2020. Yet Dettloff continued to work with Correction Officers Divish Brown who continued to come to Campbell's unit without PPE.  On April 20, 2010, Campbelll and a group of inmates brought this to the attention of Dettloff's supervisor, ARUS Parson. She

stated that these officers do not have to self-quarantine and that dying was part of prisonlife.

45.    The attitudes of these prison staff show that they don't care whether inmates live or not. Confronted with such an attitude, Campbell fears for his safety and whether he will live to see the future.

46.    Plaintiff **Lamont Heard** is an inmate presently confined at LCF. At all times relevant he was confined with MDOC under a sentence issued by a court of the State of Michigan. *See* attached Exhibit 13.

47.    Heard is confined in pole barn E-2 at LCF with identical dimensions as those in which Plaintiff Seegmiller is confined, eight men to a 10'x 12' cube, 20 cubes to each side of the pole barn..

48.    Inmates can leave their cubes starting at 5:50 am and are required to be locked down in the cubes at 11:30 pm. During the time they are not required to be in the cube, the inmates in Unit E-2 are allowed yard privileges for approximately 30 minutes at least 10 times a day. When out of their cubes, no social distancing is enforced.

49.    Heard was told by medical staff that since some inmates in Unit 2-E already tested positive and exposed other  Unit 2-E inmates, there was no reason to quarantine any of the inmates.

50.     Plaintiff Heard was informed by both medical and unit officers not to request medical care unless it was severe. However, when he asked what is considered severe, no one would tell him. Comments like that from staff creates a high level of fear that if you contract COVID-19, it will be too late to have medical staff provide life-saving care.15

51.     Heard was given three masks and told that he had to wash them because staff would not provide more masks. Heard's temperature is not regularly taken.

52.     Heard has observed prison staff pat down inmates either without gloves or without changing gloves between patting down other inmates.

**Named Defendants**

53.     Defendant **Willis Chapman** is the Warden at MRF and is responsible for the confinement of Plaintiff Abrams and all other inmates confined there. He is responsible reasonably to ensure the health and safety of the prisoners confined at MRF.

54.     Defendant **Noah Nagy** is the Warden at JCF and is responsible for the confinement of Plaintiff Seegmiller and all other inmates confined there. He is responsible reasonably to ensure the health and safety of the prisoners confined at JCF

---

15 On April 13, 2020, Heard filed two grievances. One grievance against the Warden for failure to protect against COVID-19 and the other grievance against the Director for her failure to protect against COVID-19. Heard received no response to either grievance.

55.     Defendant **Melinda Braman** is the Warden at SMT and is responsible for the confinement of Plaintiff Reeves and all other inmates confined there. She is responsible reasonably to ensure the health and safety of the prisoners confined at SMT.

56.     Defendant **Bryan Morrison** is the Warden at LCF. He and is responsible for the confinement of Plaintiff Lamont Heard and all other inmates confined there. He is responsible reasonably to ensure the health and safety of the prisoners confined at LCF.

57.     Defendant **Heidi Washington** is the Director of the MDOC.   She is responsible for the confinement of all inmates in the State of Michigan and is required by law to provide adequate medical care so that the named plaintiffs and class members' lives are not put in jeopardy.

58.     Each Defendant is required by the Eighth Amendment to confine Plaintiffs, and the class members, in conditions that do not subject their lives to dangerous conditions that could result in disease, death or other serious medical injuries.

59.     Each Defendant is sued in their official capacities only.

## JURISDICTION AND VENUE

60.     This action arises under the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is proper in this court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

61.   This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201and 2202.

62.   Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs seek class certification based on the method and manner that COVID-19 care is provided to those confined within the prison system today and in the future.

63.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Chapman resides in the Eastern District of Michigan; venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Michigan.

## EIGHTH AMENDMENT ISSUE OF COVID-19

### COVID-19 Is a Deadly Pandemic and a Public Health Emergency

64.   Since the end of 2019,[16] the Novel Coronavirus that causes Coronavirus Disease 2019 (or COVID-19)[17] has ravaged the world, country to country.[18] The

---

[16] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, Wall St. J. (Mar. 2020, 11:59 PM), available at www.wsj.com/articles/u-s-coronavirus-cases-top-1-000-11583917794

[17] The World Health Organization officially adopted the name COVID-19 for the novel coronavirus disease on February 11, 2020, WHO Twitter Post (Feb. 11, 2020), twitter.com/WHO/status/ 1227248333871173632?s=20

[18] The first case of COVID-19 outside of China was reported by officials in Thailand on January 8, 2020. *See* WHO statement on novel coronavirus in Thailand, WHO (Jan. 13, 2020), www.who.int/news-room/detail/13-01-2020-who-statement-on-novel-coronavirus-in-thailand     . Over the next several weeks, the outbreak spread to the Republic of Korea, Japan, and Singapore. *See* Statement on the meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV), WHO (Jan. 23, 2020)

extensive body of evidence regarding COVID-19 demonstrates that it is a highly communicable respiratory virus that spreads through airborne transmission, close contact and touching common surfaces containing the virus.

65.    On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month."[19]  The next day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), that COVID-19 "present[ed] a Public Health Emergency in the United States."[20]  "On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States."[21]

---

www.who.int/news-room/detail/23-01-2020-statement-on-the-meeting-of-the-international-health- regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov). By January 21, 2020, the first case of COVID-19 in the United States was detected in Washington State. Washington State Department of Health, 2019 Novel Coronavirus Outbreak (COVID-19), www.doh.wa.gov/emergencies/coronavirus.

[19] Public Health Emergency of International Concern declared (Jan. 30, 2020), www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (The WHO's Emergency Committee "noted that early detection, isolating and treating cases, contact tracing and social distancing measures – in line with the level of risk – can all work to interrupt virus spread").

[20] Secretary Azar Delivers Remarks on Declaration of Public Health Emergency for 2019 Novel Coronavirus (Jan. 31, 2020), www.hhs.gov/about/leadership/secretary/speeches/2020-speeches/secretary-azar-delivers-remarks-on-declaration-of-public-health-emergency-2019-novel-coronavirus.html;  Secretary Azar Declares Public Health Emergency    for    United States for    2019    Novel Coronavirus    (Jan.    31,    2020), www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel- coronavirus.html.

[21] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease

66.     On March 10, 2020, Michigan Governor Gretchen Whitmer, under MCL 30.403(4), declared a state of emergency to " mitigate the spread of COVID-19, protect the public health, and provide essential protections to vulnerable Michiganders."[22] Subsequently, Governor Whitmer determined on March 13, 2020 that COVID-19 represents a public health emergency and issued another executive order banning the gathering of all events with over 250 people.[23] Governor Whitmer then issued another Executive Order on March 23, which provides "individuals may only leave their home or place of residence under very limited circumstances" to last at least three weeks.[24]

67.     Governor Whitmer issued Executive Order 2020-29 on March 29, 2020, directing the MDOC, "to implement limited and temporary COVID-19-related

(COVID-19) Outbreak (Mar. 13, 2020), www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/  ;  *see also* WHO Director-General's opening remarks at the media briefing on COVID-19 (Mar. 11, 2020),   www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 ("WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic. Pandemic is not a word to use lightly or carelessly. It is a word that, if misused, can cause unreasonable fear, or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.").

[22]   See   Executive   Order   2020-10   (COVID-19)   (March   10,   2020), www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521790--,00.html.

[23] *See* Michigan Gov. Whitmer orders ban on all events with over 250 people due to coronavirus, Mar. 13, 2020, www.clickondetroit.com/news/local/2020/03/13/all-michigan-k-12-schools-to-close-due-to-coronavirus-concerns-officials-say/ .

[24] *See* Michigan issues stay-at-home order amid coronavirus: Here's what it means, Mar. 23, 2020, www.clickondetroit.com/news/2020/03/23/michigan-issues-stay-at-home-order-amid-coronavirus-heres-what-it-means/

protocols and procedures regarding entry into facilities operated by the Michigan Department of Corrections and transfers to and from the Department's custody. . . and to temporarily suspend certain rules and procedures to facilitate the implementation of those recommendations."[25]

68.     The Governor ordered MDOC to develop several "risk reduction protocols" related to COVID-19.

   a.  These measures include screening individuals based on temperature and travel "in a manner consistent with guidelines issued by the Centers for Disease Control and Prevention ("CDC")." EO 2020-29(1)(a).

   b.  "Developing and implementing protocols for incarcerated persons who display symptoms of COVID-19, including methods for evaluation and processes for testing, notification of the Department of Health and Human Services ("DHHS"), and isolation during testing, while awaiting test results, and in the event of positive test results. These protocols should be developed in consultation with local public health departments." EO 2020-29(1)(d).

---

[25]   See   Executive   Order   2020-29   (COVID-19)   (March   29,   2020), www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523422--,00.html .

   c. "Conducting stringent cleaning of all areas and surfaces, including frequently touched surfaces (such as doorknobs, handles, light switches, keyboards, etc.), on a regular and ongoing basis." EO 2020-29(1)(g).

   d. "Ensuring access to personal hygiene products for incarcerated persons and correctional staff, including soap and water sufficient for regular handwashing." EO 2020-29(1)(h).

   e. "Posting signage and continually educating on the importance of social distancing, handwashing, and personal hygiene." EO 2020-29(1)(j).

   f. "Practicing social distancing in all programs and classrooms-meaning a distance of at least six feet between people in any meeting, classroom or other group." EO 2020-29(1)(k).

   g. "Minimizing crowding, including interactions of groups of 10 or more people, which may include scheduling more times for meal and recreation to reduce person-to-person contact." EO 2020-29(1)(k).

69. Similarly, on March 13, 2020, Mark Hackel the Executive of Macomb County (where MRF is located) declared a state of emergency to deal with COVID-19 and so that "[e]mergency activates response and recovery elements

of the county's emergency operations plan and directs county resources to be utilized to the fullest extent."[26]

70.    In only a few months, over 2.8 million people worldwide have been diagnosed with COVID-19, and almost **300,000** of those people have died.[27] As of the drafting of this complaint, over **1,000,000** Americans have tested positive for COVID-19, while the number of deaths has risen to over **60,000**.[28] Those numbers, which are widely believed to be dramatically underreported, are growing rapidly every day. There is no vaccine or cure for COVID-19. No one is immune.

### COVID-19 Is Easily Transmissible and Will Spread Rapidly in a Prison Environment

71.    The number of COVID-19 cases is growing exponentially. Nationally, projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the most severe projections. [29]

---

[26] See Macomb County declares state of emergency due to COVID-19, March 13, 2020, www.wxyz.com/news/national/coronavirus/macomb-county-declares-state-of-emergency-due-to-covid-19

[27] World Health Organization, *Corona Virus disease 2019 (COVID-19) Situation Report – 69*, (Mar. 29, 2020), www.who.int/docs/default-source/coronaviruse/situation-reports/20200329-sitrep-69-covid- 19.pdf?sfvrsn=8d6620fa_2.

[28] https://coronavirus.jhu.edu/map.html

[29] Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), https://nymag.com/intelligencer/2020/03/cdcs-worst-case-

72.     Moreover, according to leading medical experts and virologists, a second wave of the spread of infection is all but inevitable.

73.     COVID-19 is a particularly contagious disease. A recent study showed that the virus could survive for up to three hours in the air, four hours on copper, twenty-four hours on cardboard, and two to three days on plastic and stainless steel- the same type of surfaces inmates come into contact every day in the prison setting.[30] Another study of an early cluster of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces- in the study, it was a communal restroom, like the restrooms that MDOC's inmates use.[31]

74.     New research also shows that controlling the spread of COVID-19 is even more difficult because of the prominence of asymptomatic transmission- infection, transmission by people who are contagious, but exhibit limited or no symptoms, rendering any screening tools dependent on identifying symptomatic behavior ineffective. [32]

coronavirus-model-210m-infected-1-7m- dead.html

[30] Marilynn Marchione/AP, *No vel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020), https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.fortunately

[31] Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020) https://doi.org/10.3201/eid2606.200412 .

[32] Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19?* Independent (Mar. 15, 2020), https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptoms-asymptomatic-covid-19-spread-virus-a9403311.html

75.     COVID-19 has been especially dangerous in areas of close confinement, such as cruise ships and assisted living facilities. It follows that jails and prisons are particularly vulnerable to an outbreak. In fact, jails and prisons are at an even greater risk because of their close quarters and communal living spaces.[33]

76.     Experts predict that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility." [34]

77.     Many jails throughout Michigan and all over the country, and around the world are releasing people with the aim of preventing massive outbreaks of severe illness and death from COVID-19.

78.     Governor Whitmer issued an Executive order to initiate "temporary . . . COVID-19 protocols and enhanced early-release authorization for county jails, local lockups, and juvenile detention centers. [35]  Jails across the Michigan have released inmates as a result.[36]

---

[33] Evelyn Cheng and Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, (Feb. 20, 2020), https://flipboard.com/article/china-says-more-than-500-cases-of-the-new-coronavirus-stemmed-from-prisons/f-5db96100fa%2Fcnbc.com

[34] *See* Nicole Wetsman, *Prisons and jails are vulnerable to COVID-19 outbreaks*, The Verge (Mar. 7, 2020), https://flipboard.com/article/china-says-more-than-500-cases-of-the-new-coronavirus-stemmed-from-prisons/f-5db96100fa%2Fcnbc.com  (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

[35] See, Temporary COVID-19 protocols for entry into Michigan Department of Corrections facilities and transfers to and from Department custody; temporary recommended COVID-19 protocols and enhanced early-release authorization for county jails, local lockups, and juvenile detention centers, March 10, 2020, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523422--,00.html

[36] See Hundreds of inmates released from Metro Detroit county jails amid coronavirus (COVID-19) outbreak, April 1, 2020, https://www.clickondetroit.com/news/local/2020/04/02/hundreds-of-

79.    The CDC recommends the following for virus transmission prevention:

    a.  Wash hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing.

    b.  If soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol. Cover all surfaces of your hands and rub them together until they feel dry.

    c.  Stay home if you are sick, except to get medical care.

    d.  After coughing or sneezing, immediately wash your hands with soap and water for at least 20 seconds. If soap and water are not readily available, clean your hands with a hand sanitizer that contains at least 60% alcohol.

    e.  Clean and disinfect frequently touched surfaces daily.[37]

    f.  Engage in social distancing.

80.    Many of these recommendations—like staying home if sick—are simply not feasible in a prison. That is all the more reason it is important to take the proper precautions that can be taken.

**COVID-19 Poses a High Risk of Serious Illness and Death to Older Adults and Adults with Underlying Medical Conditions.**

inmates-released-from-metro-detroit-county-jails-amid-coronavirus-covid-19-outbreak/

[37] How to Protect Yourself–Coronavirus Disease 2019 (COVID-19), CDC (Mar. 18, 2020), www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last visited Apr. 25, 2020).

81.    COVID-19 is more likely to cause serious illness and death for older adults and those with certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke developmental delay, and pregnancy.[38] These underlying medical conditions increase the risk of serious COVID- 19 disease for people of any age. For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 infection, symptoms such as fever, coughing, and shortness of breath can be especially severe.

82.    Plaintiffs Abrams and Campbell are typical members of subclass of those inmates who are designated as chronic care inmates due to their high risk of medical complications and the subclass of those confined in a double bunk cell. (**Ex**. **7, Abrams, ¶ 2; Ex.  19, Hawkins, page 4, ¶¶1-3; Ex. 22, Marr, ¶¶3-4**).[39]

---

[38] The MDOC's healthcare system has designated patients who suffer these ailments as Chronic Care patients and can be easily identified from the medical record system.

[39] Medical information in this and the paragraphs that follow are drawn from the expert testimony of two medical professionals filed in a recent filed federal case in Washington State, as well the website of the Harvard Medical School. *See* Expert Declaration of Dr. Marc Stern, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 6, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-marc-stern; Expert Declaration of Dr. Robert Greifinger, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 4, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-robert-greifinger;

83.    The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart and liver.

84.    Patients with serious cases of COVID-19 require advanced medical support, including negative pressure ventilation and extracorporeal mechanical oxygenation in intensive care. Patients not killed by serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.

85.    Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

86.    Many people infected with the virus, however, are completely asymptomatic carriers. People can be infected with the virus and not display any

Expert Declaration of Dr. Jonathan Golob, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 5, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-jonathan-golob; Coronavirus Resource Center, Harvard Health Publishing, Harvard Medical School (Mar. 27, 2020), https://www.health.harvard.edu/diseases-andconditions/coronavirus-resource-center.

symptoms, or only have very mild symptoms, but still spread the disease to others who may not be as lucky.

87.    Most people in high-risk categories who develop serious symptoms will need advanced supportive care requiring highly specialized equipment that is in limited supply, such as ventilator assistance, and a team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. That level of support can quickly exceed local health care resources.

88.    Chronic care patients should expect a prolonged recovery, including the need for extensive rehabilitation to accommodate profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

89.    The infection rate of COVID-19 is at least ten times higher than that of a severe seasonal influenza, even in advanced countries with highly effective health care systems. According to preliminary data from China, a much greater percentage of people in high-risk categories who contracted COVID-19 died than those who were not in high-risk categories.[40]

---

[40] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019* (COVID-19), at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv, (Feb. 27, 2020) at 5, https://www.who.int/publications-detail/report-of-the-who-china-joint-mission-on-coronavirus-disease-2019-(covid-19)    (finding

90.    The only known, effective measures to reduce the risk for vulnerable people of serious illness or death caused by COVID-19 are aggressive social distancing and heightened attention to hygiene and disinfection—measures that MDOC is making impossible at prisons with double-bunking and prisons with dormitory settings in pole barns.

### CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

91.    Because of this looming disaster, the CDC has published guidance for correctional and detention facilities to prepare and protect inmates and personnel from the COVID-19 pandemic.[41] The CDC's guidance includes the following advice for preventing the spread of COVID-19 in a correctional or detention facility:

> a. Facilities should ensure availability of sufficient stocks of hygiene supplies, cleaning supplies, personal protective equipment ("PPE"), and medical supplies (consistent with the healthcare

---

that even after adjusting for age and smoking status, patients with COVID- 19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, the number for two comorbidities was 2.59); Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (March 11, 2020), tb. 1, www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext (finding that among hospital patients, who tended to be older, of those who had COVID-19 and died, 48% had hypertension, 31% had diabetes, and 24% had coronary heart disease).

[41] CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities, CDC, www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-criteria (last visited Apr. 25, 2020).

capabilities of the facility).

    i. This includes liquid soap, alcohol-based hand sanitizer containing at least 60% alcohol, recommended PPE including facemasks and gloves, and supplies for testing, such as sterile viral transport media and sterile swabs.

b. Facilities should make contingency plans in the event of PPE shortages.

c. Facilities should provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.

d. Facilities should provide alcohol-based hand sanitizer containing at least 60% alcohol.

e. Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including cleaning and disinfecting frequently touched surfaces several times per day, such as bathrooms, telephone areas, kiosk areas, and microwave areas, etc.

f. Facilities should encourage all persons in the facility to protect themselves by practicing good cough etiquette and good hand hygiene and avoiding touching of the eyes, nose, or mouth.

g. Facilities should encourage these behaviors by posting signage throughout the facility and communicating the information verbally on a regular basis.

h. Facilities should implement social distancing strategies to increase the physical space between incarcerated persons (ideally 6 feet between all individuals, regardless of the presence of symptoms), such as when feeding in the housing unit and when the inmates are standing in line, waiting to use the showers, waiting to use telephone or the Jpay system.

  o This should include enforcing increased space between individuals in cells, pole barns, and other places where inmates are confined and, staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, limiting the size of group activities, and rearranging housing spaces to increase space between individuals.

  o This should include separating those with chronic care issues from within the present prisons and place them in facilities that have lower risk to exposure to the coronavirus.

i. Facilities should be providing inmates with information and consistent updates about COVID-19 and its symptoms.

**The MDOC Has Adopted Grossly Inadequate Polices in Response to the COVID-19 Pandemic**

92.     While the MDOC has implemented policies in response to the COVID-19 pandemic, these procedures are woefully inadequate and do not comport with many of the CDC's recommendations.  While the MDOC issued a Director's Office Memorandum on Management of COVID-19 on April 8, 2020 for all Michigan Correctional Facilities, MDOC's policy does not implement all the CDC Guidelines for prisons. *See* attached Exhibit 27.

93.     For example, the CDC recommends considering "relaxing restrictions on allowing alcohol-based sanitizer in the secure setting where security concerns allow."[42] MDOC's policy acknowledges that hand sanitizer is a method for preventing COVID-19, and MDOC is allowing until further notice, alcohol-based hand sanitizer and wipes that are provided to correctional facilities by the Department to be permitted within the secure perimeter of a correctional facility for use by staff.

94.     However, staff are not permitted to bring alcohol-based hand sanitizer or wipes through the gate. MDOC still mandates that inmates are not allowed to

---

[42] *See note 50, supra.*

use any sanitizers and suggest that inmate use soap to wash their hands. But as MDOC's own policies acknowledge, this is not always practical, and thus inmates are at an increased risk of contracting and spreading COVID-19.

95.    In addition to being inadequate, some of MDOC's policies are impossibly opaque, further preventing proper precautions from taking place. For example, the CDC guidance explains that, while difficult, social distancing "is a cornerstone to reducing transmission of respiratory diseases such as COVID-19."[43]  The CDC then provides examples of steps that can be taken in prisons and jails.[44]  The MDOC's Memorandum, in contrast, states only that facilities should follow social distancing recommendations, including within programing, classrooms, chow lines, staff screenings, office buildings, etc. The MDOC states that there should be a distance of at least six feet between all individuals, but there is no implementation of the policy especially as to housing, chow hall, and exercise areas.   Notably, since inmates cannot control the movement and behavior of other inmates, they cannot maintain social distancing without the aid of MDOC staff to enforce it.

96.    Inmates are still allowed yard time at certain prisons and also are allowed to gather in the chow hall without social separation. There are no restrictions for

---

[43] *Id*.
[44] *Id*.

distancing when it comes to using the bathroom or bunking with other inmates in cubes, cells and other living areas, such as dayrooms, classrooms and gyms.

97.    The Director's Memorandum ignores the crucial issue of how the policies are to be implemented.

## FACTUAL ALLEGATIONS IN MICHIGAN PRISONS

98.    MDOC seems to have entered the beginning stages of full pandemic within its prisons. It has caused fear in the inmates what will happen to them:

> Inmate Efren Paredes Jr., an inmate at Lakeland, said the virus has taken a toll on those behind bars.
> "[45]The mood around the prison is very somber. There's a great deal of pain and anxiety people are experiencing during this time, understandably so, …"

99.    Human beings confined inside Michigan prisons sleep within three feet of each other. They are denied medical treatment or must wait several days to receive it, do not have adequate access to soap, and share multiple common areas without adequate supplies to clean them. They are shuffled from housing unit to housing unit with no regard for which people are symptomatic and which are not. The inmates cannot protect themselves, including by practicing social distancing, and they do not have access to the necessary hygiene services and facilities to avoid infection, which puts them at imminent risk of substantial bodily harm and death.

---

[45]        https://komonews.com/news/coronavirus/600-inmates-test-positive-for-covid19-in-one-michigan-prison.

100.   People confined in prisons must "be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). Yet Plaintiffs, as well as the class and subclasses they represent, all face imminent risk of serious injury or death once they are exposed to COVID-19 in the prison.

101.   Starkly, in the midst of a public health crisis, the people currently confined with MDOC have no adequate safeguards against the severe threat of this novel coronavirus—all they ask is to be treated humanely while they are confined with in the custody of MDOC during this perilous time, without the ability to protect themselves from the virus or to get medical care outside of prison medical providers.

102.   Because of the ongoing, systemic violations of Plaintiffs' constitutional rights, Plaintiffs seek class-wide relief requiring Defendants to take basic and necessary steps to safeguard the health of people who, due to the nature of their confinement, are not only at heightened risk of infection and death but are also rendered unable to take the simple steps to protect themselves that have become common place outside of prison.

103.   Plaintiffs request that MDOC be ordered to test all inmates, even those who are asymptomatic.

104.   Plaintiffs request that MDOC be ordered to reopen some of the available cell blocks or prisons and separate those who have tested positive from those who have not.

105.   Plaintiffs also request that those inmates who are medically designated as chronic care inmates should be placed in cellblocks or prisons with access and proximity to appropriate intensive care facilities.

106.   Plaintiffs are aware that it is the intent of Defendants to open a unit called Green Oaks facility next door to the Woodland Correctional Facility in Whitmore Lake.  This facility has been closed for a number of years.  It is to hold less than 200 inmates. The memorandum issued by prison staff does not designate what inmates will be confined at Green Oaks, but it is assumed that those who have tested positive for COVID-19 will be placed there.

107.   The below was provided by a whistleblower that works at one of the prisons.

> This morning the Department has informed MCO that an additional location will be used to house COVID-19 positive prisoners. It is the vacant Green Oaks facility next door to the Woodland Correctional Facility in Whitmore Lake. They intend to open this location at the end of next week and are currently seeking volunteers statewide to temporarily work at this location. It will house less than 200 prisoners and the officers will work 12 hour shifts with the usual RDO sets that we currently have at other locations. Officers will be provided full PPE at this location. Volunteers will be provided hotel lodging, per diems and travel reimbursement per the policy. Volunteer requests will be screened by the Department and the selection criteria will likely be the current staffing levels of the facility the volunteer is currently at. In addition to seeking volunteers, it is likely that the Department will temporarily reassign officers from surrounding work locations to this

location as was done in the Jackson complex and at Lakeland. These temporary reassignments are authorized under emergency conditions per our contract (Article 4) and Civil Service rules. The target number of officers to work at Green Oaks is 50. I will post the volunteer memo from the Department at the bottom of this update.

108.   The problem with this "remedy" is that MDOC has over 1500 inmates that have testified positive, so MDOC will continue to confine the COVID 19 positive inmates with those who are not positive.

109.   Plaintiffs believe that the following cell blocks could be opened and used to house infected inmates. Cell blocks 4, 5, 6, 7, 8, 11 and 12 at Jackson Prison. The Standish Correctional facility was closed about 10 years ago, but it is still standing and could be made functional.

**Facts from Other Inmates**

110.   The named Plaintiffs have also gathered factual declarations from other inmates as to their conditions of confinement in relation to the COVID-19.

    a. Demonte Anderson is confined in a pole barn at Cotton Prison and states that he was given no cleaning supplies and was not provided social distancing in the pole barn, at chow, or in the yard. See attached Exhibit 17.[46]

---

[46] The rumor is that within a week or two, JCF (Cotton Prison) will start testing all inmates.

b. Jason Canrell is confined at Oak Correctional Facility in a double bunk cell. There is no social distancing during chow or yard. See attached Exhibit 18.

c. Dax Hawkins is confined at Kinross Correctional Facility in a pole barn and is a Chronic Care inmate. There is no social distancing in the pole barn, at chow, or any place in the pole barn. See attached Exhibit 19.

d. Dwight Henley is confined at Macomb Prison in a two-person cell. The dayroom in the housing unit has been turned into a 16-bed cube and these 16 inmates must use our bathrooms, telephones, kiosks and showers. The officers do pat downs using the same gloves to pat each inmate down. See attached Exhibit 20.

e. Mitchell Hodges is confined at Lakeland Prison in a pole barn.[47] Inmates are not engaging in distancing in the pole barn, at meals, and in the yard. See attached Exhibit 21.

f. Trevor Killian is now confined at Gus Harrison Correction Facility. When confined at Parnall Prison and without being furnished PPE, he was forced to clean the gym and weight pit that was being used by those

---

[47] This is the prison that undertook testing of all inmates, and the results from the returned tests, was that 600 inmates had tested positive. *See* notes 7-9, *supra*.

that were tested positive for COVID-19. After being forced to clean the gym he tested positive for COVID-19. See attached Exhibit 22.

g. Eugene Marr is confined at Cotton Prison in a pole barn with 160 other inmates. He is designated at a Chronic Care inmate but is provided no separation from the 160 other inmates in the pole barn. See attached Exhibit 23.

h. Lu Szenay is confined at the Women's Prison in a two-person cell. The women are not required to social distance from other inmates in the unit she is confined in. See attached Exhibit 24.

i. Robert Winburn is confined at the Cotton Prison and is housed in a Pole Barn. There is no attempt at social distancing of the 160 inmates in the pole barn, at chow, or at yard. Medical staff are passing out medications in the pole bar, which requires the inmates to stand in long lines, and the medical staff do not change their masks or gloves when passing medications. See attached Exhibit 25.

j. David Lyons is confined at Macomb Prison and on April 16, 2020, was moved to Housing Unit 2, which contained positive tested inmates and those who had not tested positive, such as himself. See attached Exhibit 26.

**MDOC's Confinement of Positive Tested Inmates in Segregation**

111.  At certain prisons, Defendants confined inmates who tested positive for COVID-19 in segregation, usually in bunk beds in the hallway of these units. This procedure is contrary to medical experts warnings.

> Placement of positive tested inmates in segregation will exacerbate the conditions for spreading COVID-19.  Dr. Elizabeth Chiao has opinied that such placement does not per se prevent the spread of COVID-19 virus through the prison. Disciplinary segregation or solitary confinement is not an effective disease containment strategy. Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.[48]

112.  This Court should issue an order precluding the confinement of positive tested inmates in segregation and to require that these inmates be placed in a separate, medical housing unit.

## CLASS ACTION ALLEGATIONS

113.  Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly situated persons.

114.  Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated with the MDOC, at its different prisons,

---

48 *See* attached Exhibit 14, Expert Decl. of Elizabeth Y. Chiao, ¶13, *Russell, et al. v. Harris County, Texas,* No. 4:19-cv-00226 (EDF No. 32-2 (S.D. Tex. Mar. 27, 2020).

and who are subjected to the MDOC's policies and practices regarding COVID-19 ("Class"). This present class would be more than 37,000 inmates.

115. Alternately, Plaintiffs seek to represent five subclasses of MDOC's inmates:

A. Those inmates who are **Double Bunked** in individual cells and are not able to engage in social distancing as required by the CDC guidelines based on the conditions within the housing units.

B. Those inmates who are confined in **Pole Barns** that have two sections, with each section containing at least 20 cubes, holding 8 inmates in an area of 8'x12'.

C. Those inmates who have been designated by medical staff as **Chronic Care** inmates and according to the CDC are at high risks of severe illnesses from COVID-19 infection, including death – these high-risk conditions include:

☐ People aged 65 or older;

☐ People with chronic lung disease or moderate to severe asthma;

☐ People who have serious heart conditions;

☐ People who are immunocompromised including cancer treatment; and

☐ People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not

well controlled, such as those with diabetes, renal failure, or liver disease.

D.    Those inmates confined in **open cellblocks**.

E.    Those inmates who have not tested positive who are confined in cell blocks with inmates who have **tested positive**.

116.   All named Plaintiffs are typical members of the Class.

117.   Plaintiff Abrams and inmate Cantrell are typical members of the subclass of those inmates who are confined to a two-person cell. (**Ex. 7, Abrams, ¶ 3;** *see also* **Ex. 18, Cantrell, ¶2**).

118.   Plaintiffs Abrams and Campbell are typical members of subclass of those inmates who are designated as Chronic Care inmates due to their High-Risk of medical complications and the subclass of those confined in a double bunk cell. (**Ex. 7, Abrams, ¶ 2; Ex.  23, Marr, ¶¶3-4**).

119.   Plaintiffs Seegmiller, Campbell, and Heard are typical members of the subclass of those inmates confined in Pole Barns. (**Ex. 8, Seegmiller, ¶ 2; Ex. 12, Cambpell, ¶4; Ex. 13, Heard, ¶2**).

120.   Plaintiff Reeves is a typical member of the subclass of those confined in an open cell block. (**Ex. 9, Reeves, ¶3; Ex. 11, Glass, ¶¶2-6**).

121.   Both Plaintiff Glass are  typical members of the subclass of those inmates confined in an open housing unit that encourages the spread of COVID-19 and where

staff have placed 29 COVID-19-infected inmates in the same housing unit without providing precautionary measures to those confined in that unit from becoming infected. (**Ex. 11, Glass, ¶¶2-4**).

122.   This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

123.   **Numerosity:** The joinder of each class member would be impracticable because the class is so numerous. The approximate number of Class members exceeds 37,000.

   a.   The subclass of **double bunking** would in the thousands. Joining all members of the Class is impracticable due to the size and the fluctuating population of the MDOC.

   b.   The subclass of those confined in **Pole Barns** would be 2,000 or more inmates. Joining all members of the Class is impracticable due to the size and the fluctuating population of the MDOC.

   c.   As to those designated as **Chronic Care** patients by MDOC, approximately 550 inmates over age of 55 live at LCF. Joining all 550 inmates over age 65 would be impracticable. In addition, some of the housing units at Lakeland are designated as "Chronic Care Units".

Joining all members of the Class is impracticable due to the size and the fluctuating population of the MDOC.

    d. The subclass of those inmates confined in open cellblocks would be 1,500 or more inmates. Joining all members of the Class is impracticable due to the size and the fluctuating population of the MDOC

    e. The subclass of those inmates confined in the dayrooms, gyms and classrooms would be over 500 inmates when all prisons are totaled. Joining all members of the Class is impracticable due to the size and the fluctuating population of the MDOC.

124. **Commonality:** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, in that they all have a right to be administered COVID-19 prevention, testing, and treatment measures. The common questions of law and fact include:

    a. Whether the proposed Class of approximately 37,000 inmates are being subjected to COVID-19 in an unconstitutional manner;

    b. Whether Defendants adequately protect the Class and subclasses from the immediate threat of COVID-19;

    c. Whether the failure of the Defendants to comply with the CDC's guidelines for prisons as to COVID-19 imposes a substantial risk of serious harm or death to those confined with MDOC;

d.  Whether the Defendants' requirement of two inmates confined to a single cell violates the social separation and creates a substantial risk of injury or death to the Class and subclasses;

e.  Whether the Defendants' requirement of 8 inmates to be confined to a cube in Pole Barns, with a total confinement of 160 inmates in the Pole Barn, violates the social separation and creates a substantial risk of injury or death to those inmates so confined;

f.  Whether Defendants' placement of inmates on bunk beds in the day rooms, gym or other rooms where the inmates cannot engage in social separation create a substantial risk of injury or death;

g.  Whether the Defendants allow inmates to gather in the chow hall for meals without enforcing social distancing creates a substantial risk of injury or death;

h.  Whether the Defendants allow inmates to gather in the yards without enforcing social distancing creates a substantial risk of injury or death;

i.  Whether Plaintiffs and the class members' Eighth Amendment rights are being violated by Defendants' failure to implement adequate procedures and practices to protect the class from COVID-19 in violation of the Eighth Amendment; and

j. Whether Defendants' failure to implement adequate procedures and practices against the COVID-19 virus constitutes cruel and unusual punishment under the Eighth Amendment., including death.

125. **Typicality:** Plaintiff's claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants and are based not only on identical legal theories, but also seek identical relief. All members of the Class are similarly injured by Defendants' wrongful conduct and the harms Plaintiffs suffer are typical of the harms suffered by the Class.

**Adequacy of Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interest contrary to those of class members. Plaintiffs' class counsel, Daniel E. Manville, is engaged in two other class action against the MDOC's Director: *Bownes, et al. v. Washington, et. al.*, Case No. 2:14-cv- 11691 (E.D. Mich.), Hon. Laurie J. Michelson, and *Ackerman, et al., v. Washi*ngton, Case No. 4:13-cv-14137 (E.D. Mich.), Hon. Linda V. Parker. Class Counsel Ernst Chara & Lovell are currently engaged in two other class actions, one involving the Michigan Unemployment Insurance Agency Cahoo, et. al. v. SAS Institute, Inc., Case No. 2:17-cv-10657 (E.D. Mich), Hon. David M. Lawson, and one against the Cities of Detroit and Hamtramck, Robertson, e al v. Breakthrough Towing, et al, Case No. 2:19-cv-10266, Hon.

126.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable.

127.    Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

128.    Plaintiffs do not seek monetary damages, except as may be incidental to declaratory or injunctive relief.

<strong>Exhaustion</strong>

129.    Pursuant to the Prison Litigation Reform Act (PLRA), MDOC's inmates are required to exhaust the available prison grievance process prior to the filing of a lawsuit.  42 U.S.C. § 1997e(a).

130.    The named Plaintiffs in this case filed grievances against their respective warden-Defendants and separate grievances against Defendant- MDOC Director Washington.

131.    Prison officials either (1) have not processed the grievances, (2) reject the grievances claiming Defendants are complying with policy, (3) reject the grievances because the inmates are grieving a policy, which is not allowed by MDOC's grievance policy directive[49], (4) reject the grievance against the Director by claiming

---

[49] Exhibit 15, Policy Directive 03.02.130, Prisoner/Parolee Grievances, Para. J.8.

it is duplicative of the grievance against the warden, or (5) request more time to provide responses to grievances.

132.   If an inmate has tested positive, prison officials refuse to allow the inmate to file a grievance and confiscate all the inmate's property for at least 14 or more days.

133.   In *Rose v. Blake*, 136 S.Ct. 1850, 1858 (2016), the United States Supreme Court recognized that exhaustion is not required if the grievance process is not available. The Court looked to whether the processes were "capable of use for the accomplishment of a purpose," and whether the sought-after relief "is accessible or may be obtained" *Id*. at 1858-59 (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). *See also Does 8-10 v. Snyder*, 945 F.3d 951, 963 (6th Cir. 2019) (holding "MDOC's PREA grievance process is, in practice, unavailable"). The manner that the grievance process is functioning now makes the process unavailable.

134.   A grievance process in unavailable when a prison office responds that their office does not have the authority to consider such a claim, "(despite what regulations or guidance materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

135.   MDOC's grievance policy does not allow an inmate to grieve the "content of the policy or procedure except as it was specifically applied to the grievant." Exhibit 15, Grievance Policy, PD 03.02.130, Para. J.8. However, when Plaintiffs attempted

to challenge the social distancing policy, or the lack of PPE or sanitizer as it "applied to them", their grievances were rejected on the grounds that they were challenging the content of the policy. This Court should find that plaintiffs have exhausted all "available" remedies in compliance with the PLRA, given the unavailability of a grievance process.

136.   In considering when the grievance process is not available when imminent danger exists, Judge Posner stated that "[i]f a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available."[50] *Fletcher v. Menard Corr. Ctr.,* 623 F.3d 1171, 1173 (7th Cir. 2010) (collecting cases).[51] *See also Evans v. Saar*, 412 F. Supp. 2d 519, 527 (D. Md. 2006) (declining to dismiss for non-exhaustion, given "shortness of time," where plaintiff challenged the protocol for his impending execution and the grievance process was not complete); *Howard v. Ashcroft*, 248 F. Supp. 2d 518, 533–34 (M.D. La. 2003) (holding that

---

[50] In *Fletcher*, Judge Posner found that the prison system had an emergency grievance process that Fletcher failed to use and thus was not subject to imminent danger. *Id*. at 1174.  Michigan's grievance process does not provide for an emergency procedure.

[51] In *Fletcher*, Judge Posner went on to explain when the grievance process becomes available during an imminent danger situation.

> If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no "possibility of some relief" and so nothing for the prisoner to exhaust.

623 F.3d at 1174.

prisoner fighting transfer from community corrections to a prison need not exhaust where appeal would take months and prison officials wanted to transfer her despite any pending appeal); *Ferguson v. Ashcroft*, 248 F. Supp. 2d 547, 563–64 (M.D. La. 2003) (same as *Howard*); *Borgetti v. Bureau of Prisons*, 2003 WL 743936, *2 n.2 (N.D. Ill. Feb. 14, 2003) (holding that "the court's jurisdiction is secure" to decide a case in which the prisoner sought immediate injunctive relief and exhaustion would almost certainly take longer than the remainder of his sentence).

137.   The MDOC's grievance process can take from 60-90 days to complete all three steps. Exhibit 9, para. II. By the completion of the MDOC's grievance process, the members of the class or proposed class members could be infected with COVID 19 and/or dead from the complications it causes.

138.   All health officials have recognized COVID-19 creates an imminent danger for inmates. Therefore, the named Plaintiffs should not be required to complete the exhaustion of the grievance process when their lives are hanging in the balance.

139.   Defendants may argue that the lawsuit must be dismissed because not all named Plaintiffs had exhausted the grievance process. This argument lacks merit. *See Foster v. Gueory,* 655 F.2d 1319, 1321–22 (D.C. Cir. 1981) (explaining that each individual plaintiff in a class-action suit need not have pursued the available administrative remedies "if at least one member of the plaintiff class has met the filing prerequisite" (cited in *Jackson*, 254 F.3d at 269)).

## Conclusion

WHEREFORE, Plaintiffs and the class members request that this Court grant the following:

A. A Declaratory Judgement that their rights were violated;

B. Find that Defendants have violated the Eighth Amendment in providing of medical care as to the COVID-19 virus that all inmates are being subjected to;

C. Issue an emergency motion for temporary restraining order and a permanent injunction, requiring Defendants to:

1.  Provide testing for all prisoners within 14 days

2. Test all COs, prison staff within 14 days.

3. Provide immediate referral to hospital upon display of severe symptoms for any inmate with a positive test

4. Sanitize all commonly touched areas after every use

5. Immediate stop all inmate and CO transfers except for those related to separating COVID-19 inmates/Cos

6. Make disinfectant supplies available at all times, free of charge

7. Provide instruction materials on proper use of PPE to prevent cross-contamination, especially with gloves and masks

8.      Release lowest-level security inmates to home confinement after quarantine for 14 days

9.      Provide and require use of PPE for all inmates

10.     Enforce social distancing of at least six feet at all times

11.     Frequently communicate to all incarcerated people information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices;

12.     Ensure that each incarcerated person receives, free of charge, an individual supply of hand soap and paper towels sufficient to allow frequent hand washing and drying each day; an adequate supply of clean implements for cleaning such as sponges and brushes and disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

13.     Require that all prison staff wear person protective equipment, including CDC-recommended surgical masks, when interacting with any person or when touching surfaces in cells or common areas;

14.     Require that all prison staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

15.　　Take each incarcerated person's temperature daily (with a functioning and properly operated and sanitized thermometer) to identify potential new COVID-19 infections;

16.　　Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

17.　　Conduct immediate testing for anyone displaying known symptoms of COVID-19 and quarantine pending results;

18.　　Ensure that inmates identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video visitation with loved ones, communications with counsel, and personal property;

19.　　Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

20.　　Provide sufficient disinfecting supplies, free of charge, so inmates can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

21.　　Waive all medical co-pays for those experiencing COVID-19-related symptoms;

D.  Enter an order and judgment granting reasonable attorneys' fees and costs pursuant
    to 42 U.S.C. §1988;

E.  Order such other and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*/s/* Daniel E. Manville
Daniel Manville (P39731)
Counsel for Plaintiffs and the proposed
   Class and Subclass
Director, Civil Rights Clinic, MI.
State University College of Law
P.O. Box 1570
East Lansing, Michigan 48823
(517) 432-6866
daniel.manville@law.msu.edu

Kevin Ernst (P44223)
Ernst Charara & Lovell, PLC
Counsel for Plaintiffs and the proposed
   Class and Subclass
645 Griswold, Ste 4100
Detroit, MI 48226
313-965-5555
kevin@ecllawfirm.com

**PROOF OF SERVICE**

I, Daniel E. Manville certify, under penalty of perjury, that on April 29 , 2020 , I caused a copy
of the above document to be served by Email on AG Cori Barkman and Kevin O'Dowd, from
the Corrections Division, Attorney's Office due to the filing of an emergency motion for
temporary restraining order and motion for class certification.

/s/ Daniel E. Manville
Daniel E. Manville