# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELLIOTT ABRAMS, CRAIG
SEEGMILLER, VINCENT GLASS,
ROBERT REEVES, and LAMONT
HEARD, individually, and on
behalf of all others similarly
situated,

No. 2:20-cv-11053

HON. MARK A. GOLDSMITH

     Plaintiffs,

MAG. R. STEVEN WHALEN

v

WILLIS CHAPMAN, NOAH
NAGY, MELINDA BRAMAN,
BRYAN MORRISON, and HEIDI
WASHINGTON,

**DEFENDANTS' RESPONSE
BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING
ORDER & INJUNCTIVE
RELIEF**

     Defendants.

---

Daniel Manville (P39731)
Attorney for Plaintiffs
Civil Rights Clinic,
MSU College of Law
P.O. Box 1570
East Lansing, MI 48823
(517) 432-6866
daniel.manville@law.msu.edu

Kevin J. O'Dowd (P39383)
Kristin M. Heyse (P64353)
Scott A. Mertens (P60069)
Sara E. Trudgeon (P82155)
Cori E. Barkman (P61470)
Allan J. Soros (P43702)
Assistants Attorney General
Attorneys for MDOC Defendants
MDOC Division
P. O. Box 30217
Lansing, MI 48909
(517) 335-3055
odowdk@michigan.gov

---

Kevin Ernst (P44223)
Attorney for Plaintiffs
Ernst Charara & Lovell, PLC
645 Griswold, Ste 4100 Detroit, MI
48226 313-965-5555
kevin@ecllawfirm.com

_____/

### DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER & INJUNCTIVE RELIEF

Dana Nessel
Attorney General

Kevin J. O'Dowd
Assistant Attorney General
Attorneys for MDOC Defendants
MDOC Division
P.O. Box 30217
Lansing, MI  48909
(517) 335-3055
odowdk@michigan.gov
P39383

Dated:  May 12, 2020

## TABLE OF CONTENTS

Page

Table of Contents ...................................................................... i

Index of Authorities................................................................. iii

Concise Statement of Issue Presented.....................................vi

Controlling or Most Appropriate Authority.............................vi

INTRODUCTION................................................................... 1

Statement of Facts ................................................................. 4

Argument.............................................................................. 19

I.   Plaintiffs fail to establish a basis for this Court to grant the
     extraordinary remedy they seek of a temporary restraining
     order and/or injunctive relief. ........................................ 19

     A.   Plaintiffs are not likely to succeed on the merits of
          their Eighth Amendment deliberate indifference claim. .....21

          1.   The Eleventh Amendment prohibits this Court
               from granting the injunctive relief Plaintiffs seek
               here—forcing MDOC to follow its already existing
               COVID-19 policies.....................................................22

          2.   Plaintiffs cannot maintain an action where they
               have failed to exhaust their administrative
               remedies. ...................................................................24

          3.   Plaintiffs' Eighth Amendment claim fails given
               the MDOC's swift and robust efforts to prevent
               and contain the spread of the COVID-19 virus...........30

          4.   Plaintiffs' request for early release fails because
               such relief is not available in a § 1983 claim, it
               violates the PLRA, and the MDOC does not have
               authority to release prisoners.....................................36

B.      Given the breadth of MDOC's COVID-19 response efforts, Plaintiffs cannot show that they will suffer irreparable injury absent this Court's intervention............39

C.      Both the public interest and that of the MDOC strongly weigh against a TRO or injunction.......................................40

Conclusion and Relief Requested.............................................................43

# INDEX OF AUTHORITIES

<u>Page</u>

## Cases

*Abney v. Amgen, Inc.,* 443 F.3d 540 (6th Cir. 2006) ..............................38

*Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*,
    796 F.3d 636 (6th Cir. 2015) ...............................................................18

*Amos v. Taylor*, Case No. 4:20-CV-7, 2020 U.S. Dist. LEXIS 72532,
    *28 (N.D. Miss. Apr. 24, 2020) ...........................................................35

*Baxley v. Jividen*, No. 3:18-1526, 2020 U.S. Dist. LEXIS 61894
    (S.D. W.Va. Apr. 8, 2020) ...................................................................35

*Bell v. Wolfish*, 441 U.S. 520 (1979).......................................................20

*Burnett v. Howard,* No. 2:09-cv-37, 2010 U.S. Dist. LEXIS 30499,
    at *3 (W.D. Mich. Mar. 30, 2010).........................................................25

*Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962 (W.D.
    Mich. 2008) ..........................................................................................38

*Farmer v. Brennan*, 511 U.S. 825 (1994) .............................. 25, 29, 30, 32

*Farnsworth v. Nationstar Mortgage, LLC*, 569 Fed. Appx. 421 (6th
    Cir. 2014) .............................................................................................19

*Foster v. Gueory*, 655 F.2d 1319 (D.C. Cir. 1981) ..................................28

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966)..........................................27

*Glover v. Johnson*, 855 F.2d 277 (6th Cir. 1988) ....................................41

*Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir.
    2000) ....................................................................................................20

*Gulley v. Ogondo*, Case No. 3:19-cv-612, 2020 U.S. Dist. LEXIS
    64193 (D. Conn. Apr. 13, 2020)...........................................................36

*Hanna v. Toner*, 630 F.2d 442 (6th Cir. 1980)......................................... 40

*Helling v. McKinney*, 509 U.S. 25 (1993) ................................................ 30

*Jackson v. D.C.*, 254 F.3d 262 (D.C. Cir. 2001) ...................................... 28

*Jones v. Bock*, 549 U.S. 199 (2007) ........................................................ 25

*Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119
    (1977) ................................................................................................. 40

*Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984).................................... 20

*Marlowe v. LeBlanc*, Case No. 20-30276, 2020 U.S. App. LEXIS
    14063 (5th Cir. Apr. 27, 2020) ...................................................... 23, 28

*Maryland v. King*, ___ U.S. ___; 133 S. Ct. 1, 3 (2012).......................... 40

*McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012) ..................................... 19

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997)........ 20

*Money v. Pritzker*, 20-cv-2094, 2020 U.S. Dist. LEXIS 63599, *61
    (ND. Ill. Apr. 10, 2020)............................................................ 35, 37, 41

*Nellson v. Barnhart*, 20-cv-00756, 2020 U.S. Dist. LEXIS 66971
    (D. Colo. Apr. 16, 2020) .......................................................... 32, 34, 39

*Northeast Ohio Coal. For Homeless and Serv. Emps. Intern.
    Union, Local 1199 v. Blackwell*, 467 F.3d 999 (6th Cir. 2006)............ 20

*Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566
    (6th Cir. 2002) .................................................................................... 19

*Patio Enclosures, Inc. v. Herbst,* 39 Fed. Appx. 964 (6th Cir. 2002) ...... 39

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89
    (1984) ............................................................................................ 22, 23

*Preiser v. Rodriguez*, 411 U.S. 475 (1973)............................................... 36

*Ross v. Blake*, 136 S. Ct. 1850 (2016)...................................................... 24

*Surles v. Andison,* 678 F.3d 452 (6th Cir. 2012)......................................25

*Swain v. Junior*, Case No. 20-11622-C, 2020 U.S. App. LEXIS
14301 (11th Cir. May 5, 2020) .......................................................32, 41

*Valentine, et al. v. Collier, et al.*, Case No. 20-20207, 2020 U.S.
App. LEXIS 12941 (5th Cir. Apr. 22, 2020) ...........................23, 39, 41

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987)...................................27

*Williams v. Mehra,* 186 F.3d 685 (6th Cir. 1999) ...................................30

**Statutes**

18 U.S.C. § 3626(a)(1)-(2) ........................................................................37

18 U.S.C. § 3626(a)(2)................................................................................24

18 U.S.C. § 3626(a)(3)................................................................................37

18 U.S.C. § 3626(a)(3)(E)(i)-(ii) ...............................................................37

42 U.S.C. § 1997e(a) ..................................................................................24

Mich. Comp. Laws 791.233(1)(a) and 791.234.......................................38

**CONCISE STATEMENT OF ISSUE PRESENTED**

Where the MDOC has taken swift and comprehensive action to prevent and treat COVID-19 within its prisons, implementing many measures that go above and beyond CDC guidelines, should this Court deny Plaintiffs' request for a TRO and/or preliminary injunction?

**CONTROLLING OR MOST APPROPRIATE AUTHORITY**

_Authority_:

42 U.S.C. § 1983;

42 U.S.C. § 3626;

*Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000);

*Bell v. Wolfish*, 441 U.S. 520 (1979);

*Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984);

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984);

*Ross v. Blake*, 136 S. Ct. 1850 (2016);

*Farmer v. Brennan*, 511 U.S. 825 (1994);

*Swain v. Junior*, Case No. 20-11622-C, 2020 U.S. App. LEXIS 14301 (11th Cir. May 5, 2020);

*Nellson v. Barnhart*, 20-cv-00756, 2020 U.S. Dist. LEXIS 66971 (D. Colo. Apr. 16, 2020);

*Baxley v. Jividen*, No. 3:18-1526, 2020 U.S. Dist. LEXIS 61894 (S.D. W.Va. Apr. 8, 2020);

*Amos v. Taylor*, Case No. 4:20-CV-7, 2020 U.S. Dist. LEXIS 72532, *28 (N.D. Miss. Apr. 24, 2020);

*Money v. Pritzker*, 20-cv-2094, 2020 U.S. Dist. LEXIS 63599, *61 (ND. Ill. Apr. 10, 2020).

## INTRODUCTION

From the first moment the coronavirus (COVID-19) pandemic surfaced in Michigan, the Michigan Department of Corrections (MDOC) acted swiftly and effectively in minimizing the spread of COVID-19 within its correctional facilities.  Within a day of the Michigan Governor declaring a state of emergency after announcing two Michigan residents had tested presumptive positive for COVID-19, the MDOC issued its first of many press releases advising Michigan residents of the emergency measures being taken to protect its staff, prison population, and the community from COVID-19.  Very quickly and decisively, MDOC Director Heidi Washington provided executive leadership and direction, outlining the many steps being taken, under the professional guidance of its Chief Medical Officer (CMO) and in consultation with the Centers for Disease Control and Prevention (CDC) and the Michigan Department of Health and Human Services (MDHHS).

Through this top-down coordinated effort, from the Director and her Executive Team, to the Wardens, to the correctional and healthcare staff, and everyone in between, the MDOC implemented and enforced a comprehensive COVID-19 response across all MDOC correctional

facilities. These emergency measures address everything from the creation of isolation areas, COVID-19 testing protocols, and screening measures, the provision of personal protection equipment (PPE) to prisoners and staff, social distancing requirements and wearing of masks in facilities, the modification of prison programs and daily procedures, the modification and use of living areas and non-traditional areas to increase social distancing and to cohort prisoners, unprecedented cleaning and hygiene measures, and the education of staff and prisoners regarding MDOC's COVID-19 protocols.

In the following discussion, based on a timeline summary of the facts and from the multiple affidavits attached and discussed herein, including the MDOC's Director, the Acting Assistant Deputy Director, the Wardens from the four subject correctional facilities named as Defendants, and the MDOC's CMO, this Court will see MDOC operating at the highest professional governmental level in response to an unprecedented public-health crisis.

Despite all of this, Plaintiffs ask this Court to order the MDOC to do more. More than what is required by the CDC. And, in some

2

instances, more than what is readily available to the public out in the community.

Plaintiffs also ask this Court to do what our Supreme Court has routinely counseled federal courts against—becoming involved in the day-to-day administration of prison systems.  Plaintiffs' counsel and their experts profess to know better than the MDOC[1] about how to deal with this novel virus within its facilities, and they ask this Court to impose their processes on the MDOC—processes that do not sufficiently take into account safety, security, or limited MDOC resources.  And what Plaintiffs fail to understand is that any order requiring MDOC to take specific measures (and only those measures) to combat COVID-19 would actually inhibit MDOC's ability to protect its prison population because of the ever-changing and ever-evolving nature of the pandemic.

For all these reasons, and those set forth below, Plaintiff's motion for temporary restraining order (TRO) and/or injunctive relief must be denied.

---

[1] MDOC's response efforts have been crafted and implemented in conjunction with the CDC and the MDHHS.

## STATEMENT OF FACTS

The first case of COVID-19 in the United States of America was confirmed on January 21, 2020 in Washington State.  (Ex. A, CDC Jan. 21, 2020 Press Release.)  Seven weeks later, on the night of March 10, 2020, the first two presumptive positive cases of COVID-19 materialized in the State of Michigan.  (Ex. B, Executive Order No. 2020-4.)  That day, Michigan Governor Gretchen Whitmer declared a state of emergency.  (*Id*.)  Even though no MDOC prisoner or staff member had yet tested positive, MDOC had already begun taking steps to prevent the introduction of the virus into the 29 facilities MDOC operates.

## I.     Timeline of MDOC's Ongoing Safety Precautions

The MDOC's actions in responding to the risk of COVID-19 impacting its facilities occurred well before any prisoners or staff tested positive and before the CDC issued its *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* which was not posted until March 23, 2020. (Ex. C.)

4

Some of the early measures MDOC Director Heidi Washington implemented included engaging in close consultation with local health departments, the MDHHS, and the CDC to examine options on prevention of the spread of the virus, and this information was in turn communicated to the prison population and MDOC staff.  (Ex. D, Director Aff., ¶ 8.)  Director Washington ensured that each facility underwent additional and more frequent cleanings.  (*Id*.)  Bleach, normally forbidden within a prison, was provided to each facility for disinfecting purposes.[2]  (*Id*.)  The MDOC memorialized these actions in a March 11, 2020, press release detailing the measures being taken to protect its staff, prison population, and the community from COVID-19. (*Id*., Attach. 1, March 11, 2020 Press Release.)

On March 11, 2020, the MDOC began taking the temperature of all staff and anyone else entering the secured prison area, as well as completing a screening for any other signs or symptoms of the virus. (*Id*.)  Anyone with a temperature higher than 100.4 degrees is prohibited from entering the facility and staff are prohibited from

---

[2] Bleach has previously not been allowed to be used inside of a prison as a cleaning agent due to security reasons as bleach can cause permanent skin and nerve damage if thrown onto another person.

returning to work until their fever dissipates and they have no additional symptoms of COVID-19. (*Id.*, at ¶ 9.) Additionally, on March 13, 2020, the MDOC ceased all in-person visitation with prisoners. (*Id.*, Attach. 2, March 13, 2020 Press Release.) This was done for the safety of staff, prisoners, and the public, to minimize the risk of introducing COVID-19 into the facilities. (*Id.*, at ¶ 9.) On that date, there were only 12 known cases of COVID-19 in the state, but none yet impacting the MDOC. (*Id.*)

By March 16, 2020, various additional measures had been implemented within the MDOC, and in order to keep the public informed about what the MDOC was doing to keep its prisoners and staff safe, the MDOC posted *MDOC Coronavirus (COVID-19) Response Q&A* on its own website, as well as on social media platforms, advising the public of early measures taken to ensure the safety and well-being of the prison population, staff, and the public. (*Id.*, Attach. 3.) In addition to these early measures discussed above, other measures the MDOC has taken include, but are not limited to:

- Enhanced services for prisoners to communicate with family and friends such as free phone calls twice per week in most cases and a number of free JPay (email) messages. (*Id.* ¶ 10.)

- Stopping transfers between facilities without the approval of the Assistant Deputy Director or higher.  (*Id.*)

- Ensuring that diligent cleaning protocols were implemented and used, including the sanitizing of common areas and cells, more frequent cleaning using bleach, and requiring cleaning products to be placed next to phones and in other high traffic areas.  (*Id.*)

- Ensuring that all prisoners had access to soap, that there was an adequate supply being produced in the Michigan State Industries labs, and that an increased supply of soap was being freely provided to prisoners for their personal use and stocked in bathrooms.  (*Id.*)

- Requiring CDC posters detailing proper hygiene practices to be posted and displayed digitally on TV screens throughout the facilities.  (*Id.*)

- Encouraging social distancing throughout its facilities, including halting certain programming and group activities or running smaller groups for programs and classrooms and limiting the number of people in the chow hall at any one time in order to seat prisoners further apart.  (*Id.*)

- Increasing the processing of parole reviews and modifying procedures to minimize in-person attendance, including conducting parole interviews by video.  (*Id.*)

On March 23, 2020, the CDC posted its Interim Guidelines for Correctional Facilities.  (Ex. C.)  This document provided specific guidance to correctional and detention facilities related to COVID-19, outlining best practices concerning: (1) operational and communications preparations for COVID-19; (2) enhanced cleaning, disinfecting, and hygiene practices; (3) social distancing strategies; (4) visitor policies; (5)

infection control; (6) screening of staff, inmates, and visitors; (7) medical isolation for those testing positive; (8) healthcare for suspected cases; and (9) considerations for persons at higher risk of COVID-19. (*Id*.) By the time these guidelines were issued, the MDOC, as evidenced by the above-mentioned early measures, was already incorporating these "best practices" in its COVID-19 response strategies.

Two MDOC staff members[3] tested positive for COVID-19 on March 17, 2020. (Ex. E, MDOC March 17, 2020 Press Release.) On March 24, 2020, an inmate tested positive for COVID-19 for the first time in an MDOC facility.[4] (Ex. F, Aff. Dr. McIntyre, ¶ 5.) As with all subsequent COVID-19 positive inmates and persons under investigation (PUIs), the MDOC moved swiftly to isolate that inmate and to ensure that any of his close contacts were placed under observation to ensure that they did not develop COVID-19 symptoms. (*Id*., ¶ 25.)

---

[3] A probation agent and a Detroit Detention Center employee. (Ex. E.)

[4] There was an inmate that tested positive on March 22, 2020. However, he had been hospitalized for a non-COVID-related health issue since March 11 at two different outside hospitals. He was transferred to MDOC's Duane Waters Health Clinic to a negative pressure room. He was not released from COVID isolation until repeat testing was negative. (Aff. Dr. McIntyre, Ex. F, ¶ 4)

On March 29, 2020, Governor Whitmer issued Executive Order No. 2020-29 specifically addressing the transfer of jail inmates into the MDOC. (Ex. G, Executive Order No. 2020-29.) Pursuant to this Executive Order, effective immediately, all transfers into the MDOC's custody from a county jail or local lockup were suspended until it was determined that the county jail or local lockup had satisfactorily implemented risk-reduction protocols of their own. (*Id.*, ¶ 4.) The Executive Order also ordered the continuation of numerous risk-reduction protocols, recognizing that MDOC was already implementing the enumerated protocols at all facilities. (*Id.*, ¶ 1.)

On April 8, 2020, to reinforce the MDOC's efforts to contain COVID-19, and to ensure that all facilities were uniformly operating in the face of this crisis, Director Washington issued Director's Office Memorandum (DOM) 2020-30 to the MDOC's Executive Policy Team, the Administrative Management Team, and Wardens. (Ex. H, DOM 2020-30; Compl., R. 1-28, Ex. 27, Page ID # 164-71.) DOM 2020-30 states, "The MDOC is taking many steps to protect staff and prisoners from the spread of COVID-19, including developing isolation areas to place and treat prisoners who tested positive for COVID-19 or who are

under investigation for having COVID-19, as well as those who have

had close contact with a known-positive COVID-19 individual." (Ex. H.)

The DOM issues specific guidelines for the following topics:

- Personal Protection Equipment (PPE);
- Screening of individuals before entering a facility or office building;
- Social distancing;
- Isolation areas;
- Prisoners under investigation for COVID-19;
- Prisoner personal property;
- Precautions in correctional facilities administration (CFA) facilities;
- Credit restorations;
- Precautions to be taken by field operations administration (FOA);
- Disciplinary conferences, and
- Working remotely. (*Id.*)

## II.   Compliance with CDC Guidelines

The MDOC has continued to meet and exceed the March 23, 2020

CDC guidelines. (Ex. C.) Specifically, prisoners and staff are provided

with three reusable cloth masks that can be laundered, which are

replaced as needed. (Ex. D, Aff. Director, ¶ 16.) This practice began on

March 26, 2020, and by April 6, all facilities had been issued three

washable and reusable masks per prisoner and per staff. (*Id.*) It was

not until April 3, 2020, that the CDC issued a recommendation that masks should be worn in public. (Ex. I, CDC Apr. 3, 2020 Recommendation.) Governor Whitmer did not order the people of Michigan to wear face masks in public buildings until April 26, 2020. (Ex. J, Executive Order No. 2020-59.) By April 6, 2020, the MDOC provided over 152,000 masks to staff and prisoners and continues to ensure that all staff and prisoners are wearing masks in accordance with CDC guidelines. (Ex. D, Aff. Director, ¶ 16.)

The MDOC has also opened a previously closed facility and previously closed housing units and transformed non-traditional areas, such as gyms and dayrooms, to separate prisoners and cohort PUIs, close contacts, and prisoners in step-down—a recovery unit for those medically cleared after having recovered from the virus. (*Id.*, ¶¶ 17, 20.) Portable showers were installed in these new arrangements so individuals from one cohort would not have to mix with individuals in another group. (*Id.*, ¶ 19.) This expansion also allowed the MDOC to reduce the population among the COVID-negative prisoners in dorm-style housing units to the greatest extent possible. (*Id.*, ¶ 18.)

11

Meanwhile, the MDOC is providing COVID-19 testing at all facilities in accordance with CDC guidelines.  To ensure continuing compliance with CDC guidelines and MDOC's COVID-19 protocols, MDOC facilities provide a daily update to the Executive Team addressing all COVID-19 related developments.  (*Id.*, ¶¶ 22, 26.)  A detailed comparison of Plaintiffs' requests for relief, the CDC guidelines, and MDOC's actions is provided in Exhibit K.

The named class representatives are currently housed at Lakeland Correctional Facility (LCF), Parnall Correctional Facility (SMT), Cotton Correctional Facility (JCF), and Macomb Correctional Facility (MRF).  (Compl., R. 1, Page ID # 7-17.)  The respective Wardens of these facilities, Warden Morrison, Warden Braman, Warden Nagy, and Warden Chapman have implemented and are following CDC guidelines throughout their facilities.  As evidenced by the Wardens' affidavits, each of these facilities is meeting, if not exceeding, CDC guidelines.  (Ex. L, Aff. Morrison; Ex. M, Aff. Braman; Ex. N, Aff. Nagy; Ex. O, Chapman.)  Their affidavits illustrate the effectiveness of the MDOC's coordinated COVID-19 response measures at the facility level. The affidavits also explain the measures being implemented by the

12

individual facilities to promote social distancing in housing units, such as reducing the number of prisoners living in cube, or dorm-style, units to the extent possible and requiring inmates in bunks sleep head-to-toe or every other bunk. (*Id.*)

Acting Assistant Deputy Director (ADD) Jeremy Bush, oversees all of the facilities in MDOC's Jackson Region Facilities. (Ex. P, Aff. ADD Bush, ¶ 3.) The Jackson Region includes LCF, SMT, JCF and MRF, among additional facilities. (*Id.* ¶ 2.) ADD Bush began providing COVID-19 risk-reduction protocols to Wardens at all facilities in the Jackson Region on March 11, 2020 and receives briefings from these facilities. (*Id.* ¶¶ 4, 7.) As evidenced from the affidavits of ADD Bush, Warden Morrison, Warden Braman, Warden Nagy, and Warden Chapman, MDOC is in compliance with CDC and MDHHS guidelines and will continue to implement and enforce COVID-19 risk-reduction measures for the duration of the pandemic.

## III. Population Reduction Efforts

In addition to MDOC's swift and robust efforts to contain the spread of COVID-19 within its facilities, as well as its methods for containment when positive cases are identified, MDOC has also taken

the following actions to safely reduce its prison population during this

crisis:

- On March 30, 2020, after seeking and receiving permission from Wayne County Circuit Court, 26 probationers, who were completing the Westside Residential Alternative to Prison (WRAP) program, were released from custody to community supervision (Ex. D, Director Affidavit, ¶ 28(a));

- MDOC accelerated programming for parole violators so they could be re-paroled more quickly (*Id.*, at ¶ 28(b));

- All Holmes Youthful Trainee Act cases were reviewed, and release eligible cases were sent to the sentencing judge for consideration.  The courts approved the release of trainees housed at the Thumb Correctional Facility (*Id.*, at ¶ 28(c));

- Wardens reviewed pre-1998 prisoner cases to determine eligibility for credit restoration, which resulted in 78 prisoners becoming eligible for parole with the Parole Board granting parole in 55 cases (*Id.*, at ¶ 28(d));

- MDOC has also worked with the Parole Board to expedite its review process and reduce its number of deferrals, with the priority of moving vulnerable prisoners into the process first, i.e., those over the age of 60.  Once the Parole Board grants a parole, MDOC is actively seeking prosecutor waivers of the 28-day wait time before release (*Id.*, at ¶ 28(g));

- All of the strategies implemented by the MDOC has resulted in the following parole numbers for weeks ending on Saturday:

  - April 11, 2020: 198 paroles

  - April 18, 2020: 153 paroles

  - April 25, 2020: 233 paroles

  - May 2, 2020: 197 paroles

▪ May 9, 2020: 214 paroles (*Id*., at ¶ 28.)

On March 13, 2020, the MDOC population was 38,196. As of May 9, 2020, the MDOC population was 36,781, which represents a population decrease of 1,415 since March 13, 2020. (*Id*., at ¶ 29.) In April 2020, the prison population declined by 866. This is the largest monthly decline in known MDOC history. Previously, the largest prison population drop in a single month was 592 in July 2007. (*Id*.)

## IV.   Medical Treatment and Testing

Under the guidance of MDOC Chief Medical Officer (CMO), Dr. McIntyre, the MDOC has implemented specific COVID-19 infection control guidelines. (Ex. F, Aff. Dr. McIntyre, ¶ 5.) In addition to all the measures taken and described above, a COVID-19 Protocol, most recently updated on April 29, 2020, was provided to all MDOC healthcare staff and Wardens. (*Id*., Attach. 1, MDOC COVID-19 Guidelines Protocol.) The COVID-19 Guidelines Protocol addresses prevention, screening, evaluation, and management of COVID-19 in MDOC facilities. (*Id*., at ¶ 6.) The protocol includes, in part:

- Separate housing units dedicated as management units for all COVID-positive prisoners to provide all medically necessary treatment and separate positive inmates from the rest of the population. (*Id*., Attach. 1, at pp. 10-12.)

- Step-down units for all prisoners who previously tested positive for COVID-19 and have since been cleared by the MDOC's CMO, are symptom free, and are no longer considered contagious. Prisoners remain in the step-down unit for at least 14 days and until the prisoner tests negative before being returned to general population. (*Id.*, at p. 14.)

- Updated parole/discharge criteria addressing specific release requirements for COVID-positive prisoners, PUIs, and those in close contact (i.e., COVID-positive prisoners will not be released until they are cleared by health care according to the COVID-19 protocol). (*Id.*, at pp. 12-14.)

- Screening procedures for necessary intakes and transfers, incorporating current CDC screening guidelines. (*Id.*, at p. 4-6.)

- Staff and prisoner COVID-19 evaluation requirements in accordance with CDC guidelines. (*Id.*, at pp. 15-16.)

- Social distancing protocols applicable to programs, classrooms, chow lines, staff meetings, and any other type of gathering in accordance with current CDC guidelines. (*Id.*, at pp. 3-4, 30; Ex. Q, social distancing example photos.)

- Hygiene and facility cleaning requirements in accordance with current CDC guidelines. (Ex. F, Aff. Dr. McIntyre, Attach. 1, at pp. 3, 17-19.)

The MDOC has opened previously closed housing units separate from the main prison at Carson City Correctional Facility (DRF), G. Robert Cotton Correctional Facility (JCF) K unit, Green Oaks Temporary Facility (former Maxey Boys Training School), a wing in the Duane Waters Health Center (DWH), and a wing in the C unit at the Charles Egeler Reception & Guidance Center (RGC) to establish

COVID-19 response units and transported COVID-positive prisoners to these sites. (Ex. D, Director Aff., ¶ 20.) Macomb Correctional Facility (MRF), Cotton (JCF), Lakeland Correctional Facility (LCF), Women's Huron Valley Correctional Facility (WHV), and Detroit Reentry (DRC) (dialysis) also have their own COVID response units. (*Id.*, at ¶ 21.) These units are used to separate COVID-positive prisoners from the rest of the population, to prevent spread of the virus, and to allow for proper medical care. (*Id.*) Prisoners remain in these units until healthcare clears them to be transferred to a step-down unit. (Ex. F, Aff. Dr. McIntyre, Attach. 1, at pgs. 10-12.)

Testing conducted in the MDOC is more expansive than CDC and MDHHS guidelines. (*Id.*, ¶¶ 20-21, 48.) COVID-19 tests are given to all prisoners who show any CDC recognized symptoms, at a minimum. (Ex D, Director Aff., ¶ 22.) Additionally, the entire prisoner population of Lakeland Correctional Facility (LCF) and Cotton Correctional Facility (JCF) have been tested for COVID-19. (*Id.*, ¶ 23.) Further, the MDOC, with the assistance of the Michigan National Guard, completed testing of all six MDOC correctional facilities in the upper peninsula during the week of May 4, 2020, including Baraga Correctional Facility

17

(AMF), Marquette Branch Prison (MBP), Alger Correctional Facility
(LMF), Newberry Correctional Facility (NCF), Chippewa Correctional
Facility (URF), and Kinross Correctional Facility (KCF), as well as
Oaks Correctional Facility (ECF) in the lower peninsula. (*Id.*) MDOC
is continuing mass testing, including antibody testing, at facilities in
the lower peninsula. (*Id.*, ¶ 23.)

As of May 11, 2020, at 12:30 PM, of the 13,235 total number of
prisoners tested for COVID-19, 2,152 have tested positive, and there
have been 50 COVID-19 related prisoner deaths, which is a 2.32 percent
death rate of known positives. The death of a single prisoner is tragic,
but through the collective efforts of the MDOC staff, consistent with
CDC guidelines, MDOC continues to minimize these numbers as this
unprecedented pandemic continues to evolve.

As this Court can see, even before the first COVID-19 positive
case was identified within the MDOC, the MDOC had already
developed a comprehensive plan to prevent, contain, and control the
spread of COVID-19 within its 29 facilities with the goal of protecting
the 36,000+ prisoners in the care of MDOC. MDOC continues to meet

18

and exceed the CDC's guidelines.  Accordingly, Plaintiffs' motion should

be denied.

## ARGUMENT

### I.   Plaintiffs fail to establish a basis for this Court to grant the extraordinary remedy they seek of a temporary restraining order and/or injunctive relief.

Temporary restraining orders (TRO) and/or preliminary

injunctions "are extraordinary and drastic remedies . . . never awarded

as of right." *Am. Civil Liberties Union Fund of Michigan v. Livingston

Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (internal quotations and citation

omitted).  The moving party "bears the burden of justifying such relief."

*McNeilly v. Land*, 684 F.3d 611, 614-15 (6th Cir. 2012).  This requires a

far more stringent showing of proof than that required to survive

summary judgment.  *See Farnsworth v. Nationstar Mortgage, LLC*, 569

Fed. Appx. 421, 425 (6th Cir. 2014).  And such relief should be granted

"only if the movant carries his or her burden of proving that the

circumstances clearly demand it."  *Overstreet v. Lexington–Fayette

Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002); *Roghan v. Block,*

590 F. Supp. 150, 153 (W.D. Mich. 1984), *aff'd* 790 F.2d 540 (6th Cir.

1986) ("There is no power the exercise of which requires greater

caution, deliberation, and sound discretion, or more dangers in a doubtful case, than the issuing of an injunction.") (internal quotations and citation omitted).  Thus, Plaintiffs here must affirmatively demonstrate entitlement to injunctive relief.

A party seeking a TRO or preliminary injunction must establish four factors:  (1) a strong likelihood of success on the merits; (2) that irreparable injury would result absent an injunction; (3) that granting the injunction would not cause substantial harm to others; and (4) that the public interest would be served by granting the injunction. *Northeast Ohio Coal. For Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

"Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

Moreover, the United States Supreme Court has cautioned that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of Government, not the Judicial." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979). Thus, where a prisoner seeks to enjoin state prison officials, courts must proceed with care, recognizing the unique nature of the prison setting. *See Kendrick v. Bland*, 740 F.2d 432, 438, n. 3 (6th Cir. 1984).

For the reasons set forth below, Plaintiffs fail to satisfy any of the factors for a TRO and/or injunctive relief. Therefore, their motion must be denied.

### A. Plaintiffs are not likely to succeed on the merits of their Eighth Amendment deliberate indifference claim.

Plaintiffs allege a violation of their Eighth Amendment right based on what they deem as MDOC's inadequate response to the COVID-19 pandemic. More specifically, Plaintiffs assert that MDOC has "fail[ed] to provide [them] with reasonably safe living conditions in the face of the current COVID-19 pandemic." (Plf.s' re-filed motion for TRO, R. 22, Page ID # 826.) Because nothing could be further from the

truth, and because Plaintiffs seek relief that is not available to them,

Plaintiffs are not likely to succeed on the merits of their claim.

> **1.   The Eleventh Amendment prohibits this Court from granting the injunctive relief Plaintiffs seek here—forcing MDOC to follow its already existing COVID-19 policies.**

In their complaint,[5] Plaintiffs set forth a laundry list of 21 items

that they ask this Court to order MDOC to do what they believe will

reduce the spread of COVID-19.  (Compl., R. 1, Page ID # 53-54.)  A

majority of these items—all but items 1, 2, 8,[6] 15, and 16—were already

included in MDOC's policies and procedures before this lawsuit was

initiated.  (Ex. H.)

---

[5] Unlike Plaintiffs' motion for TRO and/or permanent injunction, which does not indicate exactly what relief Plaintiffs seek, their complaint does set forth a 21-item request for relief.  (Complaint, D/E 1, Pg. ID. 53-54.)  Defendants rely on that list for purposes of this response brief. Also, it is Defendants understanding that Plaintiffs have conceded that, based on the parties' discussions and information that has been provided about what MDOC is already doing, items 5, 7, and 21 on Plaintiffs' list are no longer at issue.

[6] To be clear, the MDOC is addressing these items in other ways than what is proposed by Plaintiffs.  For specific measures that are being taken, see Director Washington's affidavit (Ex. D) at ¶¶14, 22, 23, 24, 25, and 28.

Indeed, Plaintiffs' counsel has conceded this point[7] and acknowledged that what they really take issue with is the MDOC's implementation of its policies.  So, for the bulk of Plaintiffs' requested relief, they ask this Court to enjoin the State to follow its own laws and procedures, essentially asking this Court to force MDOC to comply with its existing policies.  But such relief is prohibited by the Eleventh Amendment and was squarely rejected by our Supreme Court in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 103-23 (1984) (holding that the Eleventh Amendment prohibits federal courts from enjoining state facilities to follow state law.)

*Pennhurst* was recently applied by the Fifth Circuit in the context of two COVID-19-related prison cases.  *Valentine, et al. v. Collier*, *et al.*, Case No. 20-20207, 2020 U.S. App. LEXIS 12941 (5th Cir. Apr. 22, 2020) (Ex. R.); *Marlowe v. LeBlanc*, Case No. 20-30276, 2020 U.S. App. LEXIS 14063 (5th Cir. Apr. 27, 2020) (Ex. S)  In both of those cases, the Fifth Circuit stayed the district courts' injunctions granted against state correctional departments, finding that plaintiffs were not likely to

---

[7] Plaintiffs' counsel advised the Court of such during the parties May 4, 2020 telephone status conference.  (Not. of Status Conf., R. 16, Page ID # 814.)

succeed on the merits of their Eighth Amendment claims because the district courts' orders merely required the departments to implement their own policies.  (Ex. R, *Valentine*, ** 9-10; Ex. S, *Marlowe*, ** 5-6.) The Fifth Circuit reasoned that "the essence of *Pennhurst* is that a federal court lacks jurisdiction to sit as a super-state executive by ordering a state entity to comply with its own law."  (Ex. S, *Marlowe*, *6.)

Here, *Pennhurst* also applies to bar the majority of Plaintiffs' requested relief because, for all but items 1, 2, 8, 15, and 16, Plaintiffs, too, are asking this Court to force MDOC to implement its already existing policies.  As such, Plaintiffs' motion for TRO and/or injunctive relief must be denied.

### 2. Plaintiffs cannot maintain an action where they have failed to exhaust their administrative remedies.

Plaintiffs' motion is subject to the limitations on injunctive relief set forth in the Prison Litigation Reform Act (PLRA), which states in part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial

weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2).

It further requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal Law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has deemed this language as mandatory and has rejected attempts to deviate from this mandate.  *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016).  Thus, "a court may not excuse a failure to exhaust, even to take [special] circumstances into account."  *Id*.  The PLRA exhaustion requirement applies to requests for TROs and injunctive relief.  See *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Further, the Supreme Court has held that "to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself."  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation

omitted).  Indeed, the Sixth Circuit has held that "[a] grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted." *Surles v. Andison,* 678 F.3d 452, 455 (6th Cir. 2012).  Where a grievance is rejected on the basis of policy, "[a]s long as the state clearly rejects a grievance for a reason explicitly set forth in the applicable grievance procedure, a subsequent § 1983 claim based on the grievance will be subject to dismissal for failure to properly exhaust." *Burnett v. Howard,* No. 2:09-cv-37, 2010 U.S. Dist. LEXIS 30499, at *3 (W.D. Mich. Mar. 30, 2010) (internal citations omitted) (Ex. T.)  MDOC's grievance policies are set forth in Policy Directive 03.02.130, "Prisoner/Parolee Grievances," effective March 18, 2019.  (Ex. U, PD 03.02.130, eff. 3/18/19.)

Here, Plaintiffs have failed to properly exhaust their administrative remedies.  Plaintiff Elliott Abrams, #974262, filed two grievances related to COVID-19 issues.[8]  Both were properly rejected as being too general, and thus non-grievable, and neither were appealed through

---

[8] Grievance MRF-20-04-0561-27z asserts that Warden Chapman is not creating a sustainable plan that prevents the spread of COVID-19. Grievance MRF-20-04-0562-28a asserts that Director Heidi Washington is putting the grievant (Abrams) at a higher risk by not creating a sustainable plan that prevents the spread of COVID-19.

Step III.[9]  Plaintiff Craig Seegmiller, #373625, filed one COVID-19

related grievance—Grievance JCF-20-04-0694-27z[10]—which was

rejected because the proper procedure is to address the issue at the

Warden's Forum, and it has not been appealed through Step III.

Plaintiff Lamont Heard, #252329, has filed two grievances regarding

COVID-19.[11]  Again, both were rejected as being too general and they

were also not appealed through Step III.

Plaintiff Jermaine Campbell, #745168, has filed two COVID-19-

related grievances.[12]  Both claim that a female housing unit staff

member was not wearing her facemask.  These grievances are still

pending.  Robert Reeves, #222810, has filed one COVID-19-related

---

[9] Grievance MRF-20-04-0561-27z was rejected at Step I for being a non-grievable issue.  Abrams appealed the Step I grievance response, and the grievance was upheld at Step II. MRF-20-04-0562-2a was rejected as a duplicate issue.  This grievance was also upheld at Step II.

[10] In that grievance, Seegmiller made the very general claim that the supervisory level staff are using an unconstitutional practice and custom related to COVID-19 that puts his life in danger.

[11] Grievance LCF-20-04-0261-27z asserts that staff failed to protect Heard from the coronavirus.  This grievance was rejected at Step I as a non-grievable issue.  Grievance LCF-20-04-0026-27z also asserts that staff failed to protect Heard from the virus.  This grievance was also rejected at Step I as a non-grievable issue.
[12] Grievances JCF-20-04-0795-03b and JCF-20-04-0797-03b.

grievance—grievance SMT-20-04-0491-27z—which alleges that the Warden and staff failed to protect him, and as a result Reeves was infected with COVID-19 and was not treated. This grievance was rejected due to not following the proper procedure to direct comments to the Warden's Forum. Plaintiff Vincent Glass, #182453, has not filed any COVID-19-related grievances.

Plaintiffs attempt to side-step this exhaustion requirement by arguing that this Court's "equitable powers" are not impaired by the PLRA. (Plf.'s' re-filed motion for TRO, R. 22, Page ID # 843-44.) However, the cases they cite to support this proposition are non-binding and inapplicable. As an initial point, *FTC v. Dean Foods Co.*, 384 U.S. 597 (1966); *Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987); and *Foster v. Gueory*, 655 F.2d 1319, 1321-22 (D.C. Cir. 1981) have nothing to do with the PLRA.[13] Further, *FTC, Wagner*, and *Jackson v. D.C.*, 254 F.3d 262, 268 (D.C. Cir. 2001) discuss entering an injunction to maintain the *status quo* pending the outcome of administrative proceedings.

---

[13] The PLRA was enacted in 1996, well after any of the cases were decided.

Plaintiffs here ask this Court to waive their PLRA exhaustion requirement altogether, and they seek affirmative relief from this Court, not to simply maintain the status quo.  Finally, the district court decision in *Marlowe v. LeBlanc*, Case No. CV-18-63, 2020 U.S. Dist. LEXIS 72146, (M.D. La. Apr. 23, 2020), upon which Plaintiffs rely, has recently been stayed by the Fifth Circuit.  (See Ex. S, *Marlowe v. LeBlanc*.)  The Fifth Circuit rejected the district court's PLRA exhaustion analysis, which excused plaintiff's failure to exhaust because "'the interests of justice' compelled it to act on an emergency basis[,]" finding that it "runs counter to Supreme Court precedent."  (*Id.* at *9 (internal citation omitted.))

In sum, while Plaintiffs attempted to file COVID-19 related grievances, none of those grievances were properly exhausted.  In every case, Plaintiffs either failed to appeal their grievances through Step III, or their grievances were still pending at the time this lawsuit was commenced.  Accordingly, because Plaintiffs have failed to properly exhaust their administrative remedies, their § 1983 claim fails as a matter of law.

### 3.   Plaintiffs' Eighth Amendment claim fails given the MDOC's swift and robust efforts to prevent and contain the spread of the COVID-19 virus.

Even if Plaintiffs had exhausted their administrative remedies as required under the PLRA and they were not seeking relief barred by the Eleventh Amendment, their motion for TRO and/or injunctive relief must still be denied because MDOC has been anything but deliberately indifferent to their health and safety during the COVID-19 pandemic.

The Eighth Amendment requires prison officials to provide humane conditions of confinement. *Farmer*, 511 U.S. at 832. To establish an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy both an objective component and subjective component. *Farmer,* 511 U.S. at 834.

Under the objective component of a conditions-of-confinement claim, a plaintiff must show that he was deprived of "the minimal civilized measures of life's necessities." *Id.* "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The subjective component, on the other hand, is broken down into three discrete questions: (1) whether a defendant was "aware of

30

facts" from which he could draw an inference that the plaintiff was exposed to a "substantial risk of serious harm"; (2) whether the defendant actually drew the inference; and (3) whether the defendant disregarded the risk. *Farmer,* 511 U.S. at 837.   In other words, the subjective component requires a plaintiff to show that the defendant possessed a "sufficiently culpable state of mind." *Id.* at 834.  Mere negligence, or even gross negligence, will not suffice.  *Id*. at 835-836; see also *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir. 1999) (en banc).

Plaintiffs fail to establish a viable Eighth Amendment claim. Given the multitude of measures that have been put in place by the MDOC to combat, contain, and treat COVID-19 within its prisons, Plaintiffs cannot show that the MDOC has been indifferent to the safety of its prisoners, including Plaintiffs, during this pandemic.

Indeed, as discussed above and as evidenced in the attached exhibits, MDOC has gone to great lengths to combat COVID-19.  There has been an unprecedented level of leadership, oversight, and communication with all MDOC facilities.  These efforts began well before any prisoners or staff tested positive, and even before the CDC issued its guidelines, and they continue daily as the MDOC works to

31

reduce the spread of the virus.  And these efforts have been done in

conjunction and consultation with MDOC's partners at the CDC and

MDHHS.  (Ex. D, Director Aff., ¶ 8.)[14]

Plaintiffs point to the following alleged failures as evidence that

Defendants are "disregarding the grave risk posed by COVID-19":  (1)

"fail[ure] to provide adequate space and cleaning/disinfectant supplies"

and (2) failure to "provide[] timely and adequate medical care to

identify, isolate, and treat people who develop symptoms."  (Plf.s' re-

filed motion for TRO, R. 22, Page ID # 853.) But these claims are belied

by the various affidavits submitted in support of this brief.

Plaintiffs make much ado about the dorm-style settings in some

facilities, arguing they are evidence of the MDOC's deliberate

indifference.  But this argument was recently rejected by the Eleventh

Circuit.  *Swain v. Junior*, Case No. 20-11622-C, 2020 U.S. App. LEXIS

14301 (11th Cir. May 5, 2020). (Ex. V.)  There, the Eleventh Circuit

concluded that the district court likely erred in finding that a

---

[14] Director Washington is a member of the Correctional Leaders
Association and is an elected representative of the Executive
Committee.  Director Washington provides guidance to other Midwest
states' directors in developing bests practices to minimize the spread of
COVID-19 in correctional facilities.  (Ex. D, Director Aff., ¶ 3.)

corrections department's "inability to achieve meaningful social distancing" was evidence of the requisite reckless state of mind for an Eighth Amendment deliberate indifference claim. (Ex. V, *Swain*, at ** 11-12.) Citing *Farmer*, the court noted that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence.'" (Ex. V, *Swain*, at *12, quoting *Farmer*, 511 U.S. at 835; see also *Nellson v. Barnhart*, 20-cv-00756, 2020 U.S. Dist. LEXIS 66971, *17 (D. Colo. Apr. 16, 2020) (stating that "[a] lack of social distancing in the law library and communal restrooms . . . does not demonstrate that defendants have disregarded the risk of COVID-19."). (Ex. W.) Further, being housed in these dorm-style units does not necessarily correlate with a higher incidence of COVID-19, as the majority of MDOC facilities with these types of units have a very low rate of COVID-positive prisoners. (Ex. X, Chart.)

MDOC has created space within the confines of its limited facilities and resources and is requiring social distancing to the maximum extent possible, including during recreation and dining. To the extent that six-foot distance cannot always be maintained other measures have been taken to promote social distancing, such as head-

to-toe placement of bunks, staggering of prisoners in chow hall lines, limiting the number of prisoners seated at a table, and delivering meals to prisoners to eliminate the use of the chow hall.  (Ex. L, Aff. Morrison; Ex. M., Aff. Braman; Ex. N, Nagy; Ex. O, Aff. Chapman.)

Also, prisoners have been provided three reusable face masks that can be laundered and an ample supply of soap and cleaning materials. In addition, bleach disinfectant is being supplied for use within living quarters, in common areas, and on frequently touched items, such as phones, computers, etc.  (*Id*., Wardens' Aff.)  Likewise, MDOC has put in place a comprehensive system for identifying, isolating, and treating people with COVID-19.  (Ex. F, Aff. Dr. McIntyre.)

Thus, despite Plaintiffs' allegations, MDOC has not disregarded the risk of COVID-19.  Rather, MDOC has clearly acted with a conscious regard toward the safety and security of the offenders and staff.  It has conducted its duties and responsibilities with the highest degree of integrity and with a great deal of respect for the value and dignity of human life.

Plaintiffs refer the Court to several cases as support for the success of their deliberate indifference claim, but those cases are

distinguishable from the instant action, as they deal with detainees (not convicted prisoners) and they involved habeas claims for compassionate release.  None of these cases support Plaintiffs' claim of deliberate indifference in this case, where the MDOC has swiftly implemented and enforced robust COVID-19 response measures for the specific purpose of protecting prisoners from the spread and impact of COVID-19.

Courts have determined that there is no likelihood of success on the merits of a deliberate indifference claim where robust COVID-19-related measures, similar to those implemented by the MDOC, have been put in place.  *Nellson v. Barnhart*, 20-cv-00756, 2020 U.S. Dist. LEXIS 66971 (D. Colo. Apr. 16, 2020) (concluding that plaintiffs were not likely to succeed on the merits of their Eighth Amendment claim where defendants took numerous steps to reduce the risk of transmission of COVID-19) (Ex. W.); *Baxley v. Jividen*, No. 3:18-1526, 2020 U.S. Dist. LEXIS 61894 (S.D. W.Va. Apr. 8, 2020) (finding no deliberate indifference where "[d]efendants . . . demonstrated actual knowledge of the risk of COVID-19, and regard it with the seriousness it deserves.") (Ex. Y.); *Amos v. Taylor*, Case No. 4:20-CV-7, 2020 U.S. Dist. LEXIS 72532, *28 (N.D. Miss. Apr. 24, 2020) (rejecting Eighth

Amendment deliberate indifference claim where the defendant "has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus.") (Ex. Z.); *Money v. Pritzker*, 20-cv-2094, 2020 U.S. Dist. LEXIS 63599, *61 (ND. Ill. Apr. 10, 2020) (holding that plaintiffs had "no chance of success" on their deliberate indifference claim where defendants had come forward with "a lengthy list of the actions" they had taken to protect inmates) (Ex. AA.)

This Court should apply that same logic here to conclude that Plaintiffs have no likelihood of success on the merits of their Eighth Amendment claim and deny Plaintiffs' request/motion for TRO and/or injunctive relief.

        **4.**    **Plaintiffs' request for early release fails because such relief is not available in a § 1983 claim, it violates the PLRA, and the MDOC does not have authority to release prisoners.**

In item 8 of their requested relief, Plaintiffs ask this Court to order MDOC to: "Release lowest-level security inmates to home confinement after quarantine for 14 days." (Compl., R. 1, Page ID # 54.) There are three reasons this request must be rejected.

First and foremost, an Eighth Amendment § 1983 action is not the appropriate mechanism to seek the release of an inmate. State prisoners seeking relief in federal court regarding the duration of their confinement can only do so by a petition writ of habeas. *Preiser v. Rodriguez*, 411 U.S. 475, 487-90 (1973) (holding that a state prisoner requesting immediate release must do so by a habeas petition, not by a § 1983 action); see also *Gulley v. Ogondo*, Case No. 3:19-cv-612, 2020 U.S. Dist. LEXIS 64193 (D. Conn. Apr. 13, 2020) (applying *Preiser* to deny a motion for TRO in a COVID-19-related § 1983 action requesting release). (Ex. BB.)

Second, Plaintiffs' request for this Court to unilaterally release them runs afoul of PLRA. Indeed, the PLRA contains special procedures for consideration of a "prisoner release order." 18 U.S.C. § 3626(a)(3). Those procedures apply to "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). A court may not enter a prisoner release order unless it "has previously entered an order for less intrusive relief that

has failed to remedy the deprivation of the Federal right sought to be remedied" and "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(1)-(2). After those requirements have been satisfied, only a three-judge court can consider and issue a prisoner release order, and only if it finds by clear and convincing evidence that "crowding is the primary cause of the violation of a Federal right" and "no other relief will remedy the violation." 18 U.S.C. § 3626(a)(3)(E)(i)-(ii). See *Money v. Pritzker*, 20-cv-2094, 2020 U.S. Dist. LEXIS 63599, *31 (N.D. Ill. Apr. 10, 2020) (Ex. AA.).

Finally, MDOC has no authority to unilaterally release a prisoner unless that prisoner meets the conditions for parole including reaching their earliest release date as required by Michigan's truth-in-sentencing requirements. See, e.g., Mich. Comp. Laws 791.233(1)(a) and 791.234. And MDOC has taken all reasonable measures within the confines of its parole-related authority to safely reduce its prison population. (Ex. D, pp. 21-22, ¶¶ 28-29.) Again, between April 11, 2020 and May 9, 2020, 995 prisoners were paroled due to MDOC's reduction efforts. (*Id.*) As such, Plaintiffs' release claim fails.

38

**B.     Given the breadth of MDOC's COVID-19 response efforts, Plaintiffs cannot show that they will suffer irreparable injury absent this Court's intervention.**

Plaintiffs have the burden to show that, without injunctive relief, they "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir. 2006) (internal quotation marks and citation omitted). "The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors." *Essroc Cement Corp. v. CPRIN, Inc.,* 593 F. Supp. 2d 962, 970 (W.D. Mich. 2008).  The demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction. *Patio Enclosures, Inc. v. Herbst,* 39 Fed. Appx. 964, 967 (6th Cir. 2002).

In COVID-19-related cases, courts have held that where the corrections department is already implementing the measures being sought, there is no irreparable harm.  (Ex. W, *Nellson*, pp. **13-16.) Likewise, courts have determined that the irreparable harm element, as it relates to COVID-19 claims, should be analyzed by asking: "whether Plaintiffs . . . will suffer irreparable injuries *even after* accounting for

the protective measures" put in place by the corrections department. (Ex. R, *Valentine*, Ex R, at \*14.)

MDOC is implementing every measure Plaintiffs ask for that is allowed by law to the maximum extent feasible.  And, like the general public, they are at risk of contracting the virus even so.  Also, like the general public, and to an even greater degree, the MDOC is constantly learning, evaluating, and changing to adapt to this pandemic.  After accounting for the extensive protective measures MDOC has put in place, Plaintiffs cannot establish irreparable harm in the absence of this Court's intervention, and their motion for TRO and/or injunctive relief should be denied.

### C.   Both the public interest and that of the MDOC strongly weigh against a TRO or injunction.

Departments of Corrections enjoy considerable latitude in the administration of state prisons.  *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."); see also *Hanna v. Toner*, 630 F.2d 442, 444 (6th Cir. 1980) (noting that "courts, especially federal courts, should be

40

reluctant to become involved in the internal administration of state prisons."). Thus, MDOC has a strong interest in promulgating and implementing its own policies for prison management. And an injunction prohibiting MDOC from doing so would be harmful. See *Maryland v. King*, ___ U.S. ___; 133 S. Ct. 1, 3 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes[15] enacted by representative of its people, it suffers a form of irreparable injury."); see also *Glover v. Johnson*, 855 F.2d 277, 286-87 (6th Cir. 1988) (recognizing that any interference by the federal court in the administration of state prisons is necessarily disruptive).

Further, because responses to this novel and ever-evolving COVID-19 pandemic necessarily change on a rapid basis, any injunction requiring the MDOC to implement certain, specific measures, and only those measures, within certain timeframes, as Plaintiffs seek would

---

[15] While these are MDOC policies and not statutes at issue, this rationale was applied by the Fifth Circuit to corrections policies because the legislature had assigned prison policymaking duties to the corrections department. (Ex. R, *Valentine*, at *11.) The same is true in Michigan. The MDOC Director has been delegated "full power and authority to supervise and control the affairs of the department, including policymaking authority by the Michigan Legislature." Mich. Comp. Laws 791.203.

actually inhibit MDOC's ability to effectively combat this virus and protect its prisoners.  Other courts have already recognized this fact. *Valentine*, Ex. R, p. *12, (finding harm to the corrections department "because the district court's order interferes with the rapidly changing and flexible system-wide approach that [it] used to respond to the pandemic. . . ."); *Swain*, Ex. V, at *15 (noting that the district court's injunction "hamstrings [defendants] with years of experience running correctional facilities, and the elected officials they report to, from acting with dispatch to respond to this unprecedented [COVID-19] pandemic); *Money*, Ex. AA, at *55 ("The judiciary is ill-equipped to manage decisions about how best to manage any inmate population—let alone a statewide population of tens of thousands of people scattered across more than a dozen facilities.  And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency.")

Finally, while the public certainly has an interest in ensuring the safety and well-being of prison inmates, it also has an interest in a well-regulated and operated prison system, as well as an interest in ensuring convicted offenders complete their required sentences.

For all these reasons, both the public interest and that of MDOC weigh heavily against the grant of a TRO and/or injunction.

## CONCLUSION AND RELIEF REQUESTED

Plaintiffs are not likely to succeed on the merits of their Eighth Amendment claim—their requested relief is barred by the Eleventh Amendment, they have failed to exhaust their administrative remedies as required by the PLRA, they cannot show that MDOC has acted deliberately indifferent to their health and safety in the face of the COVID-19 pandemic, and they cannot seek release in the context of a § 1983 action. Additionally, given the multitude of protections that have already put in place by MDOC, Plaintiffs cannot establish that they will be irreparably harmed in the absence of this Court's intervention. Finally, both the public and MDOC's interests weigh heavily against a grant of injunctive relief.

Therefore, MDOC respectfully requests that this Court deny Plaintiffs' motion for a TRO and/or preliminary injunction and award costs and attorney fees associated with defending this motion.

Respectfully submitted,

Dana Nessel
Attorney General

43

*/s/Kevin J. O'Dowd*
Kevin J. O'Dowd (P39383)
Assistant Attorney General
Attorney for State Defendants
Michigan Dept. of Attorney
General
MDOC Division
P.O. Box 30217
Lansing, MI  48909
(517) 335-3055
odowdk@michigan.gov

Dated:  May 12, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing as well as via US Mail to all non-ECF participants.

*/s/Kevin J. O'Dowd*
Kevin J. O'Dowd (P39383)

44